# IN RE DEBS, Petitioner.

ORIGINAL.

No. 11. Original. Argued March 25, 26, 1895. — Decided May 27, 1895.

The order of the Circuit Court finding the petitioners guilty of contempt, and sentencing them to imprisonment, was not a final judgment or decree.

The government of the United States has jurisdiction over every foot of soil within its territory, and acts directly upon each citizen.

While it is a government of enumerated powers, it has full attributes of sovereignty within the limits of those powers, among which are the

power over interstate commerce and the power over the transmission of the mails.

The powers thus conferred are not dormant, but have been assumed and put into practical exercise by Congressional legislation.

In the exercise of those powers the United States may remove everything put upon highways, natural or artificial, to obstruct the passage of interstate commerce, or the carrying of the mails.

While it may be competent for the government, through the executive branch and in the use of the entire executive power of the Nation, to forcibly remove all such obstructions, it is equally within its competency to appeal to the civil courts for an inquiry and determination as to the existence and the character of any of them, and if such are found to exist or threaten to occur, to invoke the powers of those courts to remove or restrain them, the jurisdiction of courts to interfere in such matters by injunction being recognized from ancient times and by indubitable authority.

Such jurisdiction is not ousted by the fact that the obstructions are accompanied by or consist of acts in themselves violations of the criminal law, or by the fact that the proceeding by injunction is of a civil character, and may be enforced by proceedings in contempt; as the penalty for a violation of such injunction is no substitute for, and no defence to, a prosecution for criminal offences committed in the course of such violation.

The complaint filed in this case clearly shows an existing obstruction of artificial highways for the passage of interstate commerce and the transmission of the mails, not only temporarily existing, but threatening to continue, and under it the Circuit Court had power to issue its process of injunction.

Such an injunction having been issued and served upon the defendants, the Circuit Court had authority to inquire whether its orders had been disobeyed, and when it found that they had been disobeyed, to proceed under Rev. Stat. § 725, and to enter the order of punishment complained of.

The Circuit Court having full jurisdiction in the premises, its findings as to the act of disobedience are not open to review on *habeas corpus* in this or any other court.

The court enters into no examination of the act of July 2, 1890, c. 647, 26 Stat. 209, on which the Circuit Court mainly relied to sustain its jurisdiction; but it must not be understood that it dissents from the conclusions of that court in reference to the scope of that act, but simply that it prefers to rest its judgment on the broader ground discussed in its opinion, believing it important that the principles underlying it should be fully stated and fully affirmed.

On July 2, 1894, the United States, by Thomas E. Milchrist, district attorney for the Northern District of Illinois, under the direction of Richard Olney, Attorney General, filed their

bill of complaint in the Circuit Court of the United States for the Northern District of Illinois against these petitioners and others. This bill set forth, among other things, the following facts : It named twenty-two railroad companies, and it alleged that they were engaged in the business of interstate commerce and subject to the provisions of the act of Congress of February 4, 1887, known as "the Interstate Commerce Act," and all other laws of the United States relating to interstate transportation of passengers and freight; that the number of passengers annually carried by them into the city of Chicago from other States than Illinois, and out of Chicago into other States than Illinois, was more than twelve millions, and in like manner that the freight so carried into and out of the city of Chicago, from and into other States than Illinois, amounted to many millions of tons ; that each of the roads was under contract to carry, and in fact carrying, the mails of the United States; that all were by statute declared post roads of the government; that many were by special acts of Congress required at any and all times to carry the troops and military forces of the United States, and provisions, munitions, and general supplies therefor; and that two of them were in the hands of receivers appointed by the courts of the United States. It stated at some length the necessity of the continued and uninterrupted running of such interstate railroads for the bringing into the city of Chicago supplies for its citizens and for the carrying on of the varied industries of that city.

The bill further averred that four of the defendants, naming them, were officers of an association known as the American Railway Union ; that in the month of May, 1894, there arose a difference or dispute between the Pullman Palace Car Company and its employés, as the result of which a considerable portion of the latter left the service of the car company ; that thereafter the four officers of the railway union combined together, and with others, to compel an adjustment of such dispute, by creating a boycott against the cars of the car company ; that, to make such boycott effective, they had already prevented certain of the railroads running out of Chicago from operating their trains, and were combining to extend

such boycott against Pullman sleeping cars by causing strikes among employés of all railroads attempting to haul the same. It charged knowledge on the part of the defendants of the necessity of the use of sleeping cars in the operation of the business of the railroads as common carriers, of the contracts for such use between the railroad companies and the car company, of the contracts, laws, and regulations binding the railway companies and the receivers to the carrying of the mails; also of the fact that sleeping cars were and of necessity must be carried upon the trains of said carriers with cars containing the mails; that with this knowledge they entered into a combination and conspiracy to prevent the railroad companies and the receivers, and each of them, from performing their duties as common carriers of interstate commerce, and in carrying into execution that conspiracy did induce various employés of the railway companies to leave the service of the companies, and prevent such companies and the receivers from securing other persons to take their places; that they issued orders, notifications, etc., to the members of the railway union to leave the service of the companies and receivers, and to prevent the companies and receivers from operating their trains; that they had asserted that they could and would tie up, paralyze, and break down any and every of said railway companies and receivers which did not accede to their demands; that in pursuance of the instructions, commands, and requests of said officers large numbers of the employés of the railway companies and receivers left their service.

Then followed these allegations:

"And your orator further charges that said defendants aimed and intended and do now aim and intend in and by the said conspiracy and combination, to secure unto themselves the entire control of the interstate, industrial and commercial business in which the population of the city of Chicago and of the other communities along the lines of road of said railways are engaged with each other, and to restrain any and all other persons from any independent control or management of such interstate, industrial or commercial enterprises save according to the will and with the consent of the defendants.

"Your orator further avers that in pursuance of said combination and conspiracy and to accomplish the purpose thereof as hereinbefore set forth, the said defendants Debs, Howard, Rogers, Keliher and others, officers of said American Railway Union, issued or caused to be issued the orders and directions as above set forth, and that in obedience of such orders and in pursuance of said conspiracy and combination, numerous employés of said railroad companies and receivers unitedly refused to obey the orders of said employers or to perform the usual duties of such service, and many others of such employés quit such service with the common purpose, and with the result of preventing said railroad companies and receivers from operating their said railroads and from transporting the United States mails, and from carrying on or conducting their duties as common carriers of interstate traffic.

"Your orator further avers that, pursuant to said combination and conspiracy, and under the direction as aforesaid of said officers and directors of said American Railway Union, said other defendants and other persons whose names are to your orator unknown, proceeded by collecting together in large numbers, by threats, intimidation, force and violence at the station grounds, yards and right of way of said railroad companies, respectively, in the State of Illinois, to prevent said railroad companies from employing other persons to fill the vacancies aforesaid; to compel others still employés of said railroad companies to quit such employment and to refuse to perform the duties of their service, and to prevent the persons remaining in such service and ready and willing to perform the duties of the same, from doing so.

"Your orator further avers that said defendants, in pursuance of said combination and conspiracy, acting under the direction of said officers and directors of said American Railway Union, did with force and violence at divers times and places within said State of Illinois and elsewhere, stop, obstruct and derail and wreck the engines and trains of said railroad companies, both passenger and freight, then and there engaged in interstate commerce and in transporting United States mails, by locking the switches of the railroad of said

railroad companies, by removing the spikes and rails from the track thereof, by turning switches and displacing and destroying signals, by assaulting and interfering with and disabling the switchmen and other employés of said railroad companies having charge of the signals, switches and tracks of said companies, and the movement of trains thereon, and in other manners by force and violence, depriving the employés of said railroad companies in charge of such trains of the control and management of the same, and by these and other unlawful means attempted to obtain and exercise absolute control and domination over the entire operations of said railroads."

The bill further set forth that there had become established in the city of Chicago a business conducted under the name of the Union Stock Yards, at which for many years immense numbers of live stock from States and Territories beyond the State of Illinois had been received, slaughtered, and converted into food products, and distributed to all quarters of the globe, and that all the large centres of population in the United States were in a great degree dependent upon those stock yards for their food supply of that character; that for the purpose of handling such live stock and the product thereof the company conducting such business operated certain railroad tracks, and that in pursuance of the combination and conspiracy aforesaid the four defendants, officers of the railway union, issued orders directing all the employés handling such railroad tracks to abandon such service.

To this was added the following:

"And your orator further alleges that in pursuance of the like combination and unlawful conspiracy, the said defendants and others combining and conspiring with them for the purpose of still further restraining and preventing the conduct of such business, have by menaces, threats and intimidation prevented the employment of other persons to take the place of the employés quitting the service of said company so operating said Union Stock Yards.

"And your orator further charges that by reason of said unlawful combination and conspiracy and the acts and doings aforesaid thereunder, the supply of coal and fuel for consump-

tion throughout the different States of the Union and of grain, breadstuffs, vegetables, fruits, meats and other necessaries of life, has been cut off, interrupted and interfered with, and the market therefor made largely unavailable, and dealers in all of said various products and the consumers thereof have been greatly injured, and trade and commerce therein among the States has been restrained, obstructed and largely destroyed."

The bill alleged that the defendants threatened and declared that they would continue to restrain, obstruct, and interfere with interstate commerce, as above set forth, and that they "will if necessary to carry out the said unlawful combination and conspiracy above set forth tie up and paralyze the operations of every railway in the United States, and the business and industries dependent thereon." Following these allegations was a prayer for an injunction. The bill was verified.

On presentation of it to the court an injunction was ordered commanding the defendants "and all persons combining and conspiring with them, and all other persons whomsoever, absolutely to desist and refrain from in any way or manner interfering with, hindering, obstructing or stopping any of the business of any of the following named railroads," (specifically naming the various roads named in the bill,) "as common carriers of passengers and freight between or among any States of the United States, and from in any way or manner interfering with, hindering, obstructing or stopping any mail trains, express trains or other trains, whether freight or passenger, engaged in interstate commerce, or carrying passengers or freight between or among the States; and from in any manner interfering with, hindering or stopping any trains carrying the mail; and from in any manner interfering with, hindering, obstructing or stopping any engines, cars or rolling stock of any of said companies engaged in interstate commerce, or in connection with the carriage of passengers or freight between or among the States; and from in any manner interfering with, injuring or destroying any of the property of any of said railroads engaged in or for the purpose of, or in connection with, interstate commerce or the carriage of

the mails of the United States or the transportation of passengers or freight between or among the States; and from entering upon the grounds or premises of any of said railroads for the purpose of interfering with, hindering, obstructing, or stopping any of said mail trains, passenger or freight trains engaged in interstate commerce, or in the transportation of passengers or freight between or among the States, or for the purpose of interfering with, injuring, or destroying any of said property so engaged in or used in connection with interstate commerce or the transportation of passengers or property between or among the States; and from injuring or destroying any part of the tracks, roadbed, or road, or permanent structures of said railroads; and from injuring, destroying, or in any way interfering with any of the signals or switches of any of said railroads; and from displacing or extinguishing any of the signals of any of said railroads, and from spiking, locking, or in any manner fastening any of the switches of any of said railroads, and from uncoupling or in any way hampering or obstructing the control by any of said railroads of any of the cars, engines, or parts of trains of any of said railroads engaged in interstate commerce or in the transportation of passengers or freight between or among the States, or engaged in carrying any of the mails of the United States; and from compelling or inducing or attempting to compel or induce, by threats, intimidation, persuasion, force, or violence, any of the employés of any of said railroads to refuse or fail to perform any of their duties as employés of any of said railroads in connection with the interstate business or commerce of such railroads or the carriage of the United States mail by such railroads, or the transportation of passengers or property between or among the States; and from compelling or inducing or attempting to compel or induce by threats, intimidation, force, or violence any of the employés of any said railroads who are employed by such railroads, and engaged in its service in the conduct of interstate business or in the operation of any of its trains carrying the mail of the United States, or doing interstate business, or the transportation of passengers and freight between and among the States,

to leave the service of such railroads; and from preventing any person whatever, by threats, intimidation, force, or violence from entering the service of any of said railroads and doing the work thereof, in the carrying of the mails of the United States, or the transportation of passengers and freight between or among the States; and from doing any act whatever in furtherance of any conspiracy or combination to restrain either of said railroad companies or receivers in the free and unhindered control and handling of interstate commerce over the lines of said railroads, and of transportation of persons and freight between and among the States; and from ordering, directing, aiding, assisting, or abetting in any manner whatever, any person or persons to commit any or either of the acts aforesaid.

"And it is further ordered that the aforesaid injunction and writ of injunction shall be in force and binding upon such of said defendants as are named in said bill from and after the service upon them severally of said writ by delivering to them severally a copy of said writ or by reading the same to them and the service upon them respectively of the writ of subpœna herein, and shall be binding upon said defendants, whose names are alleged to be unknown, from and after the service of such writ upon them respectively by the reading of the same to them or by the publication thereof by posting or printing, and after service of subpœna upon any of said defendants named herein shall be binding upon said defendants and upon all other persons whatsoever who are not named herein from and after the time when they shall severally have knowledge of the entry of such order and the existence of said injunction."

This injunction was served upon the defendants — at least upon those who are here as petitioners. On July 17 the district attorney filed in the office of the clerk of said court an information for an attachment against the four defendants, officers of the railway union, and on August 1 a similar information against the other petitioners. A hearing was had before the Circuit Court, and on December 14 these petitioners were found guilty of contempt, and sentenced to

imprisonment in the county jail for terms varying from three to six months. 64 Fed. Rep. 724. Having been committed to jail in pursuance of this order they, on January 14, 1895, applied to this court for a writ of error and also one of *habeas corpus.* The former was, on January 17, denied, on the ground that the order of the Circuit Court was not a final judgment or decree. The latter is now to be considered.

*Mr. Lyman Trumbull* for petitioners.

I. The extraordinary proceeding under which the prisoners were deprived of liberty, was commenced by the filing of a bill in equity in the name of the United States, by a district attorney, under the direction of the Attorney General. The bill is unsigned by any one, and has attached to it an affidavit of George Q. Allen, an unknown person, having no connection, so far as the record shows, with the case, stating that he has read the bill and "believes the statements therein contained are true." The bill was filed July 2. The same day an injunction was issued, without notice to anybody, against the prisoners and unknown persons, and the next day was served on some of the prisoners. The bill states that twenty-two railroads and railroad companies, and among them the Union Stock Yard and Transit Company, were chartered and organized for the purpose of continuously doing the business of common carriers of passengers and freight generally, and were doing such business among different States. So far from having such power as alleged, the Union Stock Yard and Transit Company, one of the roads named, was organized for the purpose of locating and conducting stock yards and connecting them by rail with railroads entering Chicago on the south side, and transporting between said cattle yards, "cattle and live stock and persons accompanying the same," and by the 11th section of its charter it is declared: "Nothing in this act contained shall be taken or construed as conferring upon the company hereby created any power or authority to maintain or operate a railroad for the conveyance of passengers or freight within the city of Chicago."

A large part of the bill is devoted to a statement of the amount of business done at the Union Stock Yards, the quitting of work by the employés of the company, the handling of live stock and its conversion into food, etc.

The bill states that the prisoners are officers and members of an organization known as the American Railway Union; that in May, 1894, a dispute arose between the Pullman Palace Car Company and its employés which resulted in the employés leaving the service of the company; that the prisoners, officers of the American Railway Union combining together, and with others unknown, with the purpose to compel an adjustment of the said difference and dispute between said Pullman Co. and its employés, caused it to be given out through the newspapers of Chicago, generally, that the American Railway Union would at once create a boycott against the cars manufactured by said Pullman Palace Co., and that in order to make said boycott effective, the members of the American Railway Union who were some of them employed as trainmen or switchmen, or otherwise, in the service of the railroads mentioned, which railroads or some of them are accustomed to haul the sleeping cars manufactured by the Pullman Palace Car Co., would be directed to refuse to perform their usual duties for said railroad companies and receivers in case said railroad companies thereafter attempted to haul Pullman sleeping cars.

Such is the gist of the bill. All that is subsequently alleged as to what was done by the prisoners, was for the purpose of compelling an adjustment of the difference between the Pullman Company and its employés. To accomplish this, the American Railway Union called upon its members to quit work for the companies which had persisted in hauling the Pullman cars. Was there anything unlawful in this? If not, then the prisoners and the members of the American Railway Union were engaged in no unlawful combination or conspiracy. The allegation that the prisoners, officers and directors of the American Railway Union did issue and promulgate certain orders and requests to the members of the union in the service of certain railway companies in pursuance of said

unlawful purpose or conspiracy, did not make the purpose unlawful, when the facts stated in the bill show that the purpose was not unlawful. All that the prisoners are charged with threatening to do, or having done, was for the purpose, primarily, of bringing about an adjustment of the differences between the Pullman Company and its employés. It is only incidentally in pursuit of this lawful purpose that prisoners are charged with obstructing commerce.

The boycott of the Pullman sleepers was, as the bill shows, not to obstruct commerce, but for an entirely different purpose.

It was not unlawful for the American Railway Union to call off the members of the organization, although it might incidentally affect the operation of the railroads. Refusing to work for a railroad company is no crime, and though such action may incidentally delay the mails or interfere with interstate commerce, it being a lawful act, and not done for that purpose, is no offence.

II. In the proceeding now before the court the main question is whether the bill states a case over which a court of equity has jurisdiction; if not, then the injunction was void and the prisoners are entitled to their discharge.

This court has often said that equity jurisdiction of the Federal courts is such as was exercised by the high court of chancery of England at the time of the adoption of the Constitution, or has been conferred upon them by Congress. *Mills v. Cohn,* 150 U. S. 202.

This is not a bill by the owner of property to prevent an irreparable injury. The government does not own the railroads. It is a bill by the government to prevent interference with the private property of the citizen, lest such interference restrain commerce among the States.

It was said by this court, (*License Tax Cases,* 5 Wall. 470,) alluding to the internal commerce or domestic trade of the States: "Over this commerce Congress has no power of regulation, nor any direct control. This power belongs exclusively to the States. No interference by Congress with the business of citizens transacted within a State is warranted by the Constitution, except such as is strictly incidental to the exercise of

powers clearly granted to the legislature." *Genesee Chief*, 12 How. 443, 452; *Veazie* v. *Moor*, 14 How. 568.

The chancery court of England entertained no such jurisdiction when the Constitution was adopted.

If the prisoners were guilty of an offence against the United States by any acts which interfered with the transportation of the mails, the laws provide for their punishment; but equity has no jurisdiction to grant an injunction to stay proceedings in a criminal matter. "If they did," said Chief Justice Holt, "the court of Queen's Bench would break it, and protect any that would proceed in contempt of it." Accordingly, in the case of *Lord Montague* v. *Dudman*, Lord Hardwicke allowed a demurrer to a bill for an injunction to stay proceedings on a mandamus issued to compel the lord of a manor to hold a court. "The court," he said, "has no jurisdiction to grant an injunction to stay proceedings on a mandamus, or on an indictment, or an information, or a writ of prohibition." 3 Perkins' ed. Daniell's Ch. Pr. 1721.

III. It is not in the power of Congress to confer upon a court of equity jurisdiction unless of an equitable nature, which jurisdiction over crimes is not. The Constitution recognizes and confers upon the judicial department jurisdiction in certain cases in law and equity, and provides that trial of all crimes, except in cases of impeachment, shall be by jury, and in common law cases preserves the right of trial by jury. It is not competent for Congress to break down this distinction between law and equity by conferring upon courts of equity, jurisdiction of criminal and common law cases and thereby deny parties the right to a jury trial.

The act to protect trade and commerce against unlawful restraints and monopolies does not apply to the case stated in the bill. If it does, then it is unconstitutional. If a court of equity is authorized to restrain and prevent persons from the commission of crimes or misdemeanors prohibited by law, it must have the power to enforce its restraining order. In this case some of the parties are sentenced to imprisonment for six months, and for what? For doing some of the things forbidden by a criminal statute. If they have done none of the

things forbidden, they have not violated the injunction, for it could only restrain them from doing what the law forbade. It follows that by indirection a court of equity under its assumed jurisdiction to issue injunctions and punish for contempts, is made to execute a criminal statute and deprive persons of their liberty without a jury trial. This a court of equity has no power to do, nor is it competent for Congress to confer such a power on a court of equity.

*Mr. Assistant Attorney General Whitney* for the United States.

*Mr. S. S. Gregory* for the petitioners.

*Mr. Edwin Walker* for the United States.

*Mr. Attorney General* for the United States.

*Mr. C. S. Darrow* for the petitioners.

Mr. Justice Brewer, after stating the case, delivered the opinion of the court.

The case presented by the bill is this: The United States, finding that the interstate transportation of persons and property, as well as the carriage of the mails, is forcibly obstructed, and that a combination and conspiracy exists to subject the control of such transportation to the will of the conspirators, applied to one of their courts, sitting as a court of equity, for an injunction to restrain such obstruction and prevent carrying into effect such conspiracy. Two questions of importance are presented: First. Are the relations of the general government to interstate commerce and the transportation of the mails such as authorize a direct interference to prevent a forcible obstruction thereof? Second. If authority exists, as authority in governmental affairs implies both power and duty, has a court of equity jurisdiction to issue an injunction in aid of the performance of such duty.

First. What are the relations of the general government to interstate commerce and the transportation of the mails? They are those of direct supervision, control, and management. While under the dual system which prevails with us the powers of government are distributed between the State and the Nation, and while the latter is properly styled a government of enumerated powers, yet within the limits of such enumeration it has all the attributes of sovereignty, and, in the exercise of those enumerated powers, acts directly upon the citizen, and not through the intermediate agency of the State.

"The government of the Union, then, is, emphatically and truly, a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit."

"No trace is to be found in the Constitution of an intention to create a dependence of the government of the Union on those of the States, for the execution of the great powers assigned to it. Its means are adequate to its ends; and on those means alone was it expected to rely for the accomplishment of its ends. To impose on it the necessity of resorting to means which it cannot control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important designs, and is incompatible with the language of the Constitution." Chief Justice Marshall in *McCulloch* v. *Maryland*, 4 Wheat. 316, 405, 424.

"Both the States and the United States existed before the Constitution. The people, through that instrument, established a more perfect union by substituting a national government, acting, with ample power, directly upon the citizens, instead of the confederate government, which acted with powers, greatly restricted, only upon the States." Chief Justice Chase in *Lane County* v. *Oregon*, 7 Wall. 71, 76.

"We hold it to be an incontrovertible principle, that the government of the United States may, by means of physical force, exercised through its official agents, execute on every foot of American soil the powers and functions that belong to

it.   This necessarily involves the power to command obedience to its laws, and hence the power to keep the peace to that extent.

" This power to enforce its laws and to execute its functions in all places does not derogate from the power of the State to execute its laws at the same time and in the same places.   The one does not exclude the other, except where both cannot be executed at the same time.   In that case, the words of the Constitution itself show which is to yield.   'This Constitution, and all laws which shall be made in pursuance thereof,   . . . shall be the supreme law of the land.'"   Mr. Justice Bradley in *Ex parte Siebold*, 100 U. S. 371, 395.   See also, *Schooner Exchange* v. *McFaddon*, 7 Cranch, 116, 136 ; *Cohens* v. *Virginia*, 6 Wheat. 264, 413; *Legal Tender Cases*, 12 Wall. 457, 555; *Tennessee* v. *Davis*, 100 U. S. 257 ; *The Chinese Exclusion Case*, 130 U. S. 581 ; *In re Neagle*, 135 U. S. 1 ; *Logan* v. *United States*, 144 U. S. 263 ; *Fong Yue Ting* v. *United States*, 149 U. S. 698 ; *In re Quarles, ante*, 532.

Among the powers expressly given to the national government are the control of interstate commerce and the creation and management of a post office system for the nation.   Article I, section 8, of the Constitution provides that " the Congress shall have power.   . . .   Third, to regulate commerce with foreign nations and among the several States, and with the Indian tribes.   . . .   Seventh, to establish post offices and post roads."

Congress has exercised the power granted in respect to interstate commerce in a variety of legislative acts.   Passing by for the present all that legislation in respect to commerce by water, and considering only that which bears upon railroad interstate transportation, (for this is the specific matter involved in this case,) these acts may be noticed : First, that of June 15, 1866, c. 124, 14 Stat. 66, carried into the Revised Statutes as section 5258, which provides :

" Whereas the Constitution of the United States confers upon Congress, in express terms, the power to regulate commerce among the several States, to establish post roads, and to raise and support armies : Therefore, *Be it enacted by the*

*Senate and House of Representatives of the United States of America in Congress assembled,* That every railroad company in the United States whose road is operated by steam, its successors and assigns, be, and is hereby, authorized to carry upon and over its road, boats, bridges, and ferries all passengers, troops, government supplies, mails, freight, and property on their way from any State to another State, and to receive compensation therefor, and to connect with roads of other States so as to form continuous lines for the transportation of the same to the place of destination."

Second. That of March 3, 1873, c. 252, 17 Stat. 584, (Rev. Stat. §§ 4386 to 4389,) which regulates the transportation of live stock over interstate railroads. Third. That of May 29, 1884, c. 60, § 6, 23 Stat. 31, 32, prohibiting interstate transportation by railroads of live stock affected with any contagious or infectious disease. Fourth. That of February 4, 1887, c. 104, 24 Stat. 379, with its amendments of March 2, 1889, c. 382, 25 Stat. 855, and February 10, 1891, c. 128, 26 Stat. 743, known as the "interstate commerce act," by which a commission was created with large powers of regulation and control of interstate commerce by railroads, and the sixteenth section of which act gives to the courts of the United States power to enforce the orders of the commission. Fifth. That of October 1, 1888, c. 1063, 25 Stat. 501, providing for arbitration between railroad interstate companies and their employés; and, sixth, the act of March 2, 1893, c. 196, 27 Stat. 531, requiring the use of automatic couplers on interstate trains, and empowering the Interstate Commerce Commission to enforce its provisions.

Under the power vested in Congress to establish post offices and post roads, Congress has, by a mass of legislation, established the great post office system of the country, with all its detail of organization, its machinery for the transaction of business, defining what shall be carried and what not, and the prices of carriage, and also prescribing penalties for all offences against it.

Obviously these powers given to the national government over interstate commerce and in respect to the transportation

of the mails were not dormant and unused. Congress had taken hold of these two matters, and by various and specific acts had assumed and exercised the powers given to it, and was in the full discharge of its duty to regulate interstate commerce and carry the mails. The validity of such exercise and the exclusiveness of its control had been again and again presented to this court for consideration. It is curious to note the fact that in a large proportion of the cases in respect to interstate commerce brought to this court the question presented was of the validity of state legislation in its bearings upon interstate commerce, and the uniform course of decision has been to declare that it is not within the competency of a State to legislate in such a manner as to obstruct interstate commerce. If a State with its recognized powers of sovereignty is impotent to obstruct interstate commerce, can it be that any mere voluntary association of individuals within the limits of that State has a power which the State itself does not possess?

As, under the Constitution, power over interstate commerce and the transportation of the mails is vested in the national government, and Congress by virtue of such grant has assumed actual and direct control, it follows that the national government may prevent any unlawful and forcible interference therewith. But how shall this be accomplished? Doubtless, it is within the competency of Congress to prescribe by legislation that any interference with these matters shall be offences against the United States, and prosecuted and punished by indictment in the proper courts. But is that the only remedy? Have the vast interests of the nation in interstate commerce, and in the transportation of the mails, no other protection than lies in the possible punishment of those who interfere with it? To ask the question is to answer it. By article 3, section 2, clause 3, of the Federal Constitution it is provided: " The trial of all crimes except in cases of impeachment shall be by jury; and such trial shall be held in the State where the said crime shall have been committed." If all the inhabitants of a State, or even a great body of them, should combine to obstruct interstate commerce or the transportation

of the mails, prosecutions for such offences had in such a community would be doomed in advance to failure. And if the certainty of such failure was known, and the national government had no other way to enforce the freedom of interstate commerce and the transportation of the mails than by prosecution and punishment for interference therewith, the whole interests of the nation in these respects would be at the absolute mercy of a portion of the inhabitants of that single State.

But there is no such impotency in the national government. The entire strength of the nation may be used to enforce in any part of the land the full and free exercise of all national powers and the security of all rights entrusted by the Constitution to its care. The strong arm of the national government may be put forth to brush away all obstructions to the freedom of interstate commerce or the transportation of the mails. If the emergency arises, the army of the Nation, and all its militia, are at the service of the Nation to compel obedience to its laws.

But passing to the second question, is there no other alternative than the use of force on the part of the executive authorities whenever obstructions arise to the freedom of interstate commerce or the transportation of the mails? Is the army the only instrument by which rights of the public can be enforced and the peace of the nation preserved? Grant that any public nuisance may be forcibly abated either at the instance of the authorities, or by any individual suffering private damage therefrom, the existence of this right of forcible abatement is not inconsistent with nor does it destroy the right of appeal in an orderly way to the courts for a judicial determination, and an exercise of their powers by writ of injunction and otherwise to accomplish the same result. In *Stamford* v. *Stamford Horse Railroad Co.*, 56 Connecticut, 381, an injunction was asked by the borough to restrain the company from laying down its track in a street of the borough. The right of the borough to forcibly remove the track was insisted upon as a ground for questioning the jurisdiction of a court of equity, but the court sustained the injunction, adding: "And none the less so because of its right to remove

the track by force. As a rule, injunctions are denied to those who have adequate remedy at law. Where the choice is between the ordinary and the extraordinary processes of law, and the former are sufficient, the rule will not permit the use of the latter. In some cases of nuisance and in some cases of trespass the law permits an individual to abate the one and prevent the other by force, because such permission is necessary to the complete protection. of property and person. When the choice is between redress or prevention of injury by force and by peaceful process, the law is well pleased if the individual will consent to waive his right to the use of force and await its action. Therefore, as between force and the extraordinary writ of injunction, the rule will permit the latter."

So, in the case before us, the right to use force does not exclude the right of appeal to the courts for a judicial determination and for the exercise of all their powers of prevention. Indeed, it is more to the praise than to the blame of the government, that, instead of determining for itself questions of right and wrong on the part of these petitioners and their associates and enforcing that determination by the club of the policeman and the bayonet of the soldier, it submitted all those questions to the peaceful determination of judicial tribunals, and invoked their consideration and judgment as to the measure of its rights and powers and the correlative obligations of those against whom it made complaint. And it is equally to the credit of the latter that the judgment of those tribunals was by the great body of them respected, and the troubles which threatened so much disaster terminated.

Neither can it be doubted that the government has such an interest in the subject-matter as enables it to appear as party plaintiff in this suit. It is said that equity only interferes for the protection of property, and that the government has no property interest. A sufficient reply is that the United States have a property in the mails, the protection of which was one of the purposes of this bill. *Searight* v. *Stokes*, 3 How. 151, 169, arose upon a compact between the United States and the State of Pennsylvania in respect to the Cumberland Road, which provided, among other things, " that no toll shall be

received or collected for the passage of any wagon or carriage laden with the property of the United States;" the question being whether a carriage employed in transporting the mails of the United States was one "laden with the property of the United States," and it was held that it was, the court, by Chief Justice Taney, saying: "The United States have unquestionably a property in the mails. They are not mere common carriers, but a government, performing a high official duty in holding and guarding its own property as well as that of its citizens committed to its care; for a very large portion of the letters and packages conveyed on this road, especially during the session of Congress, consists of communications to or from the officers of the executive departments, or members of the legislature, on public service, or in relation to matters of public concern. . . . We think that a carriage, whenever it is carrying the mail, is laden with the property of the United States within the true meaning of the compact."

We do not care to place our decision upon this ground alone. Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all, and to prevent the wrongdoing of one resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court. This proposition in some of its relations has heretofore received the sanction of this court. In *United States* v. *San Jacinto Tin Co.*, 125 U. S. 273, 285, was presented an application of the United States to cancel and annul a patent for land on the ground that it was obtained by fraud or mistake. The right of the United States to maintain such a suit was affirmed, though it was held that if the controversy was really one only between individuals in respect to their claims to property the government ought not to be permitted to interfere, the court saying: "If it be a question of property a case must be made in which the court can afford a remedy in

regard to that property; if it be a question of fraud which would render the instrument void, the fraud must operate to the prejudice of the United States; and if it is apparent that the suit is brought for the benefit of some third party, and that the United States has no pecuniary interest in the remedy sought, and is under no obligation to the party who will be benefited to sustain an action for his use; in short, if there does not appear any obligation on the part of the United States to the public or to any individual, or any interest of its own, it can no more sustain such an action than any private person could under similar circumstances."

This language was relied upon in the subsequent case of *United States* v. *Bell Telephone Company*, 128 U. S. 315, 367, which was a suit brought by the United States to set aside a patent for an invention on the ground that it had been obtained by fraud or mistake, and it was claimed that the United States, having no pecuniary interest in the subject-matter of the suit, could not be heard to question the validity of the patent. But this contention was overruled, the court saying, in response to this argument, after quoting the foregoing language from the *San Jacinto case:* "This language is construed by counsel for the appellee in this case to limit the relief granted at the instance of the United States to cases in which it has a direct pecuniary interest. But it is not susceptible of such construction. It was evidently in the mind of the court that the case before it was one where the property right to the land in controversy was the matter of importance, but it was careful to say that the cases in which the instrumentality of the court cannot thus be used are those where the United States has no pecuniary interest in the remedy sought, and is also under no obligation to the party who will be benefited to sustain an action for his use, and also where it does not appear that any obligation existed on the part of the United States to the public or to any individual. The essence of the right of the United States to interfere in the present case is its obligation to protect the public from the monopoly of the patent which was procured by fraud, and it would be difficult to find language more aptly used to include this in the class of cases which are not excluded

from the jurisdiction of the court by want of interest in the government of the United States."

It is obvious from these decisions that while it is not the province of the government to interfere in any mere matter of private controversy between individuals, or to use its great powers to enforce the rights of one against another, yet, whenever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the Constitution are entrusted to the care of the Nation, and concerning which the Nation owes the duty to all the citizens of securing to them their common rights, then the mere fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts, or prevent it from taking measures therein to fully discharge those constitutional duties.

The national government, given by the Constitution power to regulate interstate commerce, has by express statute assumed jurisdiction over such commerce when carried upon railroads. It is charged, therefore, with the duty of keeping those highways of interstate commerce free from obstruction, for it has always been recognized as one of the powers and duties of a government to remove obstructions from the highways under its control.

As said in *Gilman* v. *Philadelphia*, 3 Wall. 713, 724: "The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a State other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress. This necessarily includes the power to keep them open and free from any obstruction to their navigation, interposed by the States or otherwise; to remove such obstructions when they exist; and to provide, by such sanctions as they may deem proper, against the occurrence of the evil and for the punishment of offenders. For these purposes, Congress possesses all the powers which existed in the States before the adoption of the national Constitution, and which have always existed in the Parliament in England."

See also the following authorities in which at the instance of

thè State, or of some municipality thereof within whose limits the obstructed highway existed, a like power was asserted: *Stamford* v. *Stamford Horse Railroad Co.*, 56 Connecticut, 381; *People* v. *Vanderbilt*, 28 N. Y. 396; *State* v. *Dayton & Southeastern Railroad*, 36 Ohio St. 434; *Springfield* v. *Connecticut River Railroad*, 4 Cush. 63; *Attorney General* v. *Woods*, 108 Mass. 436.; *Easton and Amboy Railroad Co.* v. *Greenwich*, 25 N. J. Eq. 565; *Stearns County* v. *St. Cloud, Mankato and Austin Railroad*, 36 Minnesota, 425; *Rio Grande Railroad Co.* v. *Brownsville*, 45 Texas, 88 ; *Philadelphia* v. *13th & 15th Street Passenger Railway Co.*, 8 Phil. 648. Indeed, the obstruction of a highway is a public nuisance, 4 Bl. Com. 167,* and a public nuisance has always been held subject to abatement at the instance of the government. *Attorney General* v. *Tudor Ice Co.*, 104 Mass. 239, 244 *Attorney General* v. *Jamaica Pond Aqueduct Corporation*, 133 Mass. 361; *Village of Pine City* v. *Munch*, 42 Minnesota, 342; *State* v. *Goodnight*, 70 Texas, 682.

It may not be amiss to notice a few of the leading cases. *City of Georgetown* v. *Alexandria Canal Co.*, 12 Pet. 91, 98, was a bill filed by the plaintiff to restrain the construction of an aqueduct across the Potomac River. While under the facts of that case the relief prayed for was denied, yet, the jurisdiction of the court was sustained. After referring to the right to maintain an action at law for damages, it was said :

"Besides this remedy at law, it is now settled, that a court of equity may take jurisdiction in cases of public nuisance, by an information filed by the Attorney General. This jurisdiction seems to have been acted on with great caution and hesitancy. . . . Yet the jurisdiction has been finally sustained, upon the principle that equity can give more adequate and complete relief than can be obtained at law. Whilst, therefore, it is admitted by all that it is confessedly one of delicacy, and accordingly the instances of its exercise are rare, yet it may be exercised in those cases in which there is imminent danger of irreparable mischief before the tardiness of the law could reach it."

*State of Pennsylvania* v. *Wheeling Bridge Co.*, 13 How. 518, was a bill filed by the State of Pennsylvania to enjoin the erection of a bridge over the Ohio River within the limits of the State of Virginia. As the alleged obstruction was not within the State of Pennsylvania, its right to relief was only that of an individual in case of a private nuisance, and it was said, on page 564 :

"The injury makes the obstruction a private nuisance to the injured party ; and the doctrine of nuisance applies to the case where the jurisdiction is made out, the same as in a public prosecution. If the obstruction be unlawful, and the injury irreparable by a suit at common law, the injured party may claim the extraordinary protection of a court of chancery.

"Such a proceeding is as common and as free from difficulty as an ordinary injunction bill, against a proceeding at law, or to stay waste or trespass. The powers of a court of chancery are as well adapted, and as effectual for relief in the case of a private nuisance, as in either of the cases named. And, in regard to the exercise of these powers, it is of no importance whether the eastern channel, over which the bridge is thrown, is wholly within the limits of the State of Virginia. The Ohio being a navigable stream, subject to the commercial power of Congress, and over which that power has been exerted, if the river be within the State of Virginia, the commerce upon it, which extends to other States, is not within its jurisdiction ; consequently, if the act of Virginia authorized the structure of the bridge, so as to obstruct navigation, it could afford no justification to the bridge company."

*Coosaw Mining Co.* v. *South Carolina*, 144 U. S. 550, was a bill filed by the State in one of its own courts to enjoin the digging, mining, and removing phosphate rock and deposits in the bed of a navigable river within its territories. The case was removed by the defendant to the Federal court, and in that court the relief prayed for was granted. The decree of the Circuit Court was sustained by this court, and in the opinion by Mr. Justice Harlan, the matter of equity jurisdiction is discussed at some length, and several cases cited, among them *Attorney General* v. *Richards*, 2 Anstr. 603 ; *Attorney*

*General* v. *Forbes*, 2 My. & Cr. 123; *Gibson* v. *Smith*, 2 Atk. 182; *Attorney General* v. *Jamaica Pond Aqueduct Corporation*, 133 Mass. 361. From *Attorney General* v. *Forbes* was quoted this declaration of the Lord Chancellor: "Many cases might have been produced in which the court has interfered to prevent nuisances to public rivers and to public harbors; and the Court of Exchequer, as well as this court, acting as a court of equity, has a well established jurisdiction, upon a proceeding by way of information, to prevent nuisances to public harbors and public roads; and, in short, generally to prevent public nuisances." And from *Attorney General* v. *Jamaica Pond Aqueduct* these words of the Supreme Court of the State of Massachusetts: "There is another ground upon which, in our opinion, this information can be maintained, though perhaps it belongs to the same general head of equity jurisdiction of restraining and preventing nuisances. The great ponds of the Commonwealth belong to the public, and, like the tide waters and navigable streams, are under the control and care of the Commonwealth. The rights of fishing, boating, bathing, and other like rights which pertain to the public are regarded as valuable rights, entitled to the protection of the government. . . . If a corporation or an individual is found to be doing acts without right, the necessary effect of which is to destroy or impair these rights and privileges, it furnishes a proper case for an information by the Attorney General to restrain and prevent the mischief." An additional case, not noticed in that opinion, may also be referred to, *Attorney General.* v. *Terry*, L. R. 9 Ch. 423, in which an injunction was granted against extending a wharf a few feet out into the navigable part of a river, Mellish, L. J., saying: "If this is an indictable nuisance there must be a remedy in the Court of Chancery, and that remedy is by injunction," and James, L. J., adding: "I entirely concur. Where a public body is entrusted with the duty of being conservators of a river, it is their duty to take proceedings for the protection of those who use the river."

It is said that the jurisdiction heretofore exercised by the national government over highways has been in respect to

waterways — the natural highways of the country — and not over artificial highways such as railroads; but the occasion for the exercise by Congress of its jurisdiction over the latter is of recent date. Perhaps the first act in the course of such legislation is that heretofore referred to, of June 14, 1866, but the basis upon which rests its jurisdiction over artificial highways is the same as that which supports it over the natural highways. Both spring from the power to regulate commerce. The national government has no separate dominion over a river within the limits of a State; its jurisdiction there is like that over land within the same State. Its control over the river is simply by virtue of the fact that it is one of the highways of interstate and international commerce. The great case of *Gibbons* v. *Ogden*, 9 Wheat. 1, 197, in which the control of Congress over inland waters was asserted, rested that control on the grant of the power to regulate commerce. The argument of the Chief Justice was that commerce includes navigation, " and a power to regulate navigation is as expressly granted as if that term had been added to the word 'commerce.'" In order to fully regulate commerce with foreign nations it is essential that the power of Congress does not stop at the borders of the nation, and equally so as to commerce among the States:

" The power of Congress, then, comprehends navigation within the limits of every State in the Union, so far as that navigation may be, in any manner, connected with 'commerce with foreign nations, or among the several States, or with the Indian tribes.' It may, of consequence, pass the jurisdictional line of New York, and act upon the very waters to which the prohibition now under consideration applies."

See also *Gilman* v. *Philadelphia*, 3 Wall. 713, 725, in which it was said: " Wherever 'commerce among the States' goes, the power of the nation, as represented in this court, goes with it to protect and enforce its rights."

Up to a recent date commerce, both interstate and international, was mainly by water, and it is not strange that both the legislation of Congress and the cases in the courts have been principally concerned therewith. The fact that in recent

years interstate commerce has come mainly to be carried on by railroads and over artificial highways has in no manner narrowed the scope of the constitutional provision, or abridged the power of Congress over such commerce. On the contrary, the same fulness of control exists in the one case as in the other, and the same power to remove obstructions from the one as from the other.

Constitutional provisions do not change, but their operation extends to new matters as the modes of business and the habits of life of the people vary with each succeeding generation. The law of the common carrier is the same to-day as when transportation on land was by coach and wagon, and on water by canal boat and sailing vessel, yet in its actual operation it touches and regulates transportation by modes then unknown, the railroad train and the steamship. Just so is it with the grant to the national government of power over interstate commerce. The Constitution has not changed. The power is the same. But it operates to-day upon modes of interstate commerce unknown to the fathers, and it will operate with equal force upon any new modes of such commerce which the future may develop.

It is said that seldom have the courts assumed jurisdiction to restrain by injunction in suits brought by the government, either state or national, obstructions to highways, either artificial or natural. This is undoubtedly true, but the reason is that the necessity for such interference has only been occasional. Ordinarily the local authorities have taken full control over the matter, and by indictment for misdemeanor, or in some kindred way, have secured the removal of the obstruction and the cessation of the nuisance. As said in *Attorney General* v. *Brown,* 24 N. J. Eq. (9 C. E. Green) 89, 91: "The jurisdiction of courts of equity to redress the grievance of public nuisances by injunction is undoubted and clearly established; but it is well settled that, as a general rule, equity will not interfere, where the object sought can be as well attained in the ordinary tribunals. *Attorney General* v. *New Jersey Railroad,* 2 C. E. Green, (17 N. J. Eq.,) 136; *Jersey City* v. *City of Hudson,* 2 Beasley, (13 N. J. Eq.,) 420, 426; *Attorney*

*General* v. *Heishon*, 3 C. E. Green, (18 N. J. Eq.,) 410; *Morris & Essex Railroad* v. *Prudden*, 5 C. E. Green, (20 N. J. Eq.,) 530, 532; High on Injunctions, § 521. And because the remedy by indictment is so efficacious, courts of equity entertain jurisdiction in such cases with great reluctance, whether their intervention is invoked at the instance of the attorney general, or of a private individual who suffers some injury therefrom distinct from that of the public, and they will only do so where there appears to be a necessity for their interference. *Rowe* v. *The Granite Bridge Corporation*, 21 Pick. 340, 347; *Morris & Essex Railroad* v. *Prudden*, *supra*. The jurisdiction of the court of chancery with regard to public nuisances is founded on the irreparable damage to individuals, or the great public injury which is likely to ensue. 3 Daniell's Ch. Pr. 3d ed. Perkins's, 1740." Indeed, it may be affirmed that in no well-considered case has the power of a court of equity to interfere by injunction in cases of public nuisance been denied, the only denial ever being that of a necessity for the exercise of that jurisdiction under the circumstances of the particular case. Story's Eq. Jur. §§ 921, 923, 924; Pomeroy's Eq. Jur. § 1349; High on Injunctions, §§ 745 and 1554; 2 Daniell's Ch. Pl. and Pr. 4th ed. p. 1636.

That the bill filed in this case alleged special facts calling for the exercise of all the powers of the court is not open to question. The picture drawn in it of the vast interests involved, not merely of the city of Chicago and the State of Illinois, but of all the States, and the general confusion into which the interstate commerce of the country was thrown; the forcible interference with that commerce; the attempted exercise by individuals of powers belonging only to government, and the threatened continuance of such invasions of public right, presented a condition of affairs which called for the fullest exercise of all the powers of the courts. If ever there was a special exigency, one which demanded that the court should do all that courts can do, it was disclosed by this bill, and we need not turn to the public history of the day, which only reaffirms with clearest emphasis all its allegations.

The difference between a public nuisance and a private nui-

sance is that the one affects the people at large and the other simply the individual.   The quality of the wrong is the same, and the jurisdiction of the courts over them rests upon the same principles and goes to the same extent.   Of course, circumstances may exist in one case, which do not in another, to induce the court to interfere or to refuse to interfere by injunction, but the jurisdiction, the power to interfere, exists in all cases of nuisance.   True, many more suits are brought by individuals than by the public to enjoin nuisances, but there are two reasons for this.   First, the instances are more numerous of private than of public nuisances; and, second, often that which is in fact a public nuisance is restrained at the suit of a private individual, whose right to relief arises because of a special injury resulting therefrom.

Again, it is objected that it is outside of the jurisdiction of a court of equity to enjoin the commission of crimes.   This, as a general proposition, is unquestioned.   A chancellor has no criminal jurisdiction.   Something more than the theatened commission of an offence against the laws of the land is necessary to call into exercise the injunctive powers of the court. There must be some interferences, actual or threatened, with property or rights of a pecuniary nature, but when such interferences appear the jurisdiction of a court of equity arises, and is not destroyed by the fact that they are accompanied by or are themselves violations of the criminal law.   Thus, in *Cranford* v. *Tyrrell*, 128 N. Y. 341, an injunction to restrain the defendant from keeping a house of ill-fame was sustained, the court saying, on page 344 : " That the perpetrator of the nuisance is amenable to the provisions and penalties of the criminal law is not an answer to an action against him by a private person to recover for injury sustained, and for an injunction against the continued use of his premises in such a manner."   And in *Mobile* v. *Louisville & Nashville Railroad*, 84 Alabama, 115, 126, is a similar declaration in these words : " The mere fact that an act is criminal does not divest the jurisdiction of equity to prevent it by injunction, if it be also a violation of property rights, and the party aggrieved has no other adequate remedy for the prevention of the irreparable

injury which will result from the failure or inability of a court of law to redress such rights."

The law is full of instances in which the same act may give rise to a civil action and a criminal prosecution. An assault with intent to kill may be punished criminally, under an indictment therefor, or will support a civil action for damages, and the same is true of all other offences which cause injury to person or property. In such cases the jurisdiction of the civil court is invoked, not to enforce the criminal law and punish the wrongdoer, but to compensate the injured party for the damages which he or his property has suffered, and it is no defence to the civil action that the same act by the defendant exposes him also to indictment and punishment in a court of criminal jurisdiction. So here, the acts of the defendants may or may not have been violations of the criminal law. If they were, that matter is for inquiry in other proceedings. The complaint made against them in this is of disobedience to an order of a civil court, made for the protection of property and the security of rights. If any criminal prosecution be brought against them for the criminal offences alleged in the bill of complaint, of derailing and wrecking engines and trains, assaulting and disabling employés of the railroad companies, it will be no defence to such prosecution that they disobeyed the orders of injunction served upon them and have been punished for such disobedience.

Nor is there in this any invasion of the constitutional right of trial by jury. We fully agree with counsel that " it matters not what form the attempt to deny constitutional right may take. It is vain and ineffectual, and must be so declared by the courts," and we reaffirm the declaration made for the court by Mr. Justice Bradley in *Boyd* v. *United States,* 116 U. S. 616, 635, that " it is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis.*" But the power of a court to make an order carries with it the equal power to punish for a disobedience of that order, and the inquiry as to the question of disobedience has been, from time immemorial, the special function of the court. And

this is no technical rule. In order that a court may compel obedience to its orders it must have the right to inquire whether there has been any disobedience thereof. To submit the question of disobedience to another tribunal, be it a jury or another court, would operate to deprive the proceeding of half its efficiency. In the *Case of Yates*, 4 Johns. 314, 369, Chancellor Kent, then Chief Justice of the Supreme Court of the State of New York, said : " In the *Case of The Earl of Shaftesbury*, 2 St. Trials, 615 ; *S. C.* 1 Mod. 144, who was imprisoned by the House of Lords for ' high contempts committed against it,' and brought into the King's Bench, the court held that they had no authority to judge of the contempt, and remanded the prisoner. The court, in that case, seem to have laid down a principle from which they never have departed, and which is essential to the due administration of justice. This principle that every court, at least of the superior kind, in which great confidence is placed, must be *the sole judge*, in the last resort, of contempts arising therein, is more explicitly defined and more emphatically enforced in the two subsequent cases of the *Queen* v. *Paty and others*, and of the *King* v. *Crosby*." And again, on page 371, " Mr. Justice Blackstone pursued the same train of observation, and declared that all courts, by which he meant to include the two houses of Parliament, and the courts of Westminster Hall, could have no control in matters of contempt. That the sole adjudication of contempts, and the punishments thereof belonged exclusively, and without interfering, to each respective court." In *Watson* v. *Williams*, 36 Mississippi, 331, 341, it was said : " The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge. It is a power inherent in all courts of record, and coexisting with them by the wise provisions of the common law. A court without the power effectually to protect itself against the assaults of the lawless, or to enforce its orders, judgments, or decrees against the recusant parties before it, would be a disgrace to the legislation, and a stigma upon the age which invented it." In *Cart-*

*wright's Case*, 114 Mass. 230, 238, we find this language: "The summary power to commit and punish for contempts tending to obstruct or degrade the administration of justice is inherent in courts of chancery and other superior courts, as essential to the execution of their powers and to the maintenance of their authority, and is part of the law of the land, within the meaning of Magna Charta and of the twelfth article of our Declaration of Rights." See also *United States* v. *Hudson*, 7 Cranch, 32; *Anderson* v. *Dunn*, 6 Wheat. 204; *Ex parte Robinson*, 19 Wall. 505; *Mugler* v. *Kansas*, 123 U. S. 623, 672; *Ex parte Terry*, 128 U. S. 289; *Eilenbecker* v. *Plymouth County*, 134 U. S. 31, 36, in which Mr. Justice Miller observed: "If it has ever been understood that proceedings according to the common law for contempt of court have been subject to the right of trial by jury, we have been unable to find any instance of it;" *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447, 488. In this last case it was said "surely it cannot be supposed that the question of contempt of the authority of a court of the United States, committed by a disobedience of its orders, is triable, of right, by a jury."

In brief, a court, enforcing obedience to its orders by proceedings for contempt, is not executing the criminal laws of the land, but only securing to suitors the rights which it has adjudged them entitled to.

Further, it is said by counsel in their brief:

"No case can be cited where such a bill in behalf of the sovereign has been entertained against riot and mob violence, though occurring on the highway. It is not such fitful and temporary obstruction that constitutes a nuisance. The strong hand of executive power is required to deal with such lawless demonstrations.

"The courts should stand aloof from them and not invade executive prerogative, nor even at the behest or request of the executive travel out of the beaten path of well-settled judicial authority. A mob cannot be suppressed by injunction; nor can its leaders be tried, convicted, and sentenced in equity.

"It is too great a strain upon the judicial branch of the

government to impose this essentially executive and military power upon courts of chancery."

We do not perceive that this argument questions the jurisdiction of the court, but only the expediency of the action of the government in applying for its process. It surely cannot be seriously contended that the court has jurisdiction to enjoin the obstruction of a highway by one person, but that its jurisdiction ceases when the obstruction is by a hundred persons. It may be true, as suggested, that in the excitement of passion a mob will pay little heed to processes issued from the courts, and it may be, as said by counsel in argument, that it would savor somewhat of the puerile and ridiculous to have read a writ of injunction to Lee's army during the late civil war. It is doubtless true that *inter arma leges silent*, and in the throes of rebellion or revolution the processes of civil courts are of little avail, for the power of the courts rests on the general support of the people and their recognition of the fact that peaceful remedies are the true resort for the correction of wrongs. But does not counsel's argument imply too much? Is it to be assumed that these defendants were conducting a rebellion or inaugurating a revolution, and that they and their associates were thus placing themselves beyond the reach of the civil process of the courts? We find in the opinion of the Circuit Court a quotation from the testimony given by one of the defendants before the United States Strike Commission, which is sufficient answer to this suggestion:

"As soon as the employés found that we were arrested, and taken from the scene of action, they became demoralized, and that ended the strike. It was not the soldiers that ended the strike. It was not the old brotherhoods that ended the strike. It was simply the United States courts that ended the strike. Our men were in a position that never would have been shaken, under any circumstances, if we had been permitted to remain upon the field among them. Once we were taken from the scene of action, and restrained from sending telegrams or issuing orders or answering questions, then the minions of the corporations would be put to work.

. . . Our headquarters were temporarily demoralized and abandoned, and we could not answer any messages. The men went back to work, and the ranks were broken, and the strike was broken up, . . . not by the army, and not by any other power, but simply and solely by the action of the United States courts in restraining us from discharging our duties as officers and representatives of our employés."

Whatever any single individual may have thought or planned, the great body of those who were engaged in these transactions contemplated neither rebellion nor revolution, and when in the due order of legal proceedings the question of right and wrong was submitted to the courts, and by them decided, they unhesitatingly yielded to their decisions. The outcome, by the very testimony of the defendants, attests the wisdom of the course pursued by the government, and that it was well not to oppose force simply by force, but to invoke the jurisdiction and judgment of those tribunals to whom by the Constitution and in accordance with the settled conviction of all citizens is committed the determination of questions of right and wrong between individuals, masses, and States.

It must be borne in mind that this bill was not simply to enjoin a mob and mob violence. It was not a bill to command a keeping of the peace; much less was its purport to restrain the defendants from abandoning whatever employment they were engaged in. The right of any laborer, or any number of laborers, to quit work was not challenged. The scope and purpose of the bill was only to restrain forcible obstructions of the highways along which interstate commerce travels and the mails are carried. And the facts set forth at length are only those facts which tended to show that the defendants were engaged in such obstructions.

A most earnest and eloquent appeal was made to us in eulogy of the heroic spirit of those who threw up their employment, and gave up their means of earning a livelihood, not in defence of their own rights, but in sympathy for and to assist others whom they believed to be wronged. We yield to none in our admiration of any act of heroism or self-sacrifice, but we may be permitted to add that it is a lesson

which cannot be learned too soon or too thoroughly that under this government of and by the people the means of redress of all wrongs are through the courts and at the ballot-box, and that no wrong, real or fancied, carries with it legal warrant to invite as a means of redress the coöperation of a mob, with its accompanying acts of violence.

We have given to this case the most careful and anxious attention, for we realize that it touches closely questions of supreme importance to the people of this country. Summing up our conclusions, we hold that the government of the United States is one having jurisdiction over every foot of soil within its territory, and acting directly upon each citizen; that while it is a government of enumerated powers, it has within the limits of those powers all the attributes of sovereignty; that to it is committed power over interstate commerce and the transmission of the mail; that the powers thus conferred upon the national government are not dormant, but have been assumed and put into practical exercise by the legislation of Congress; that in the exercise of those powers it is competent for the nation to remove all obstructions upon highways, natural or artificial, to the passage of interstate commerce or the carrying of the mail; that while it may be competent for the government (through the executive branch and in the use of the entire executive power of the nation) to forcibly remove all such obstructions, it is equally within its competency to appeal to the civil courts for an inquiry and determination as to the existence and character of any alleged obstructions, and if such are found to exist, or threaten to occur, to invoke the powers of those courts to remove or restrain such obstructions; that the jurisdiction of courts to interfere in such matters by injunction is one recognized from ancient times and by indubitable authority; that such jurisdiction is not ousted by the fact that the obstructions are accompanied by or consist of acts in themselves violations of the criminal law; that the proceeding by injunction is of a civil character, and may be enforced by proceedings in contempt; that such proceedings are not in execution of the criminal laws of the land; that the penalty for a violation of

injunction is no substitute for and no defence to a prosecution for any criminal offences committed in the course of such violation; that the complaint filed in this case clearly showed an existing obstruction of artificial highways for the passage of interstate commerce and the transmission of the mail — an obstruction not only temporarily existing, but threatening to continue; that under such complaint the Circuit Court had power to issue its process of injunction; that it having been issued and served on these defendants, the Circuit Court had authority to inquire whether its orders had been disobeyed, and when it found that they had been, then to proceed under section 725, Revised Statutes, which grants power " to punish, by fine or imprisonment, . . . disobedience, . . . by any party . . . or other person, to any lawful writ, process, order, rule, decree or command," and enter the order of punishment complained of; and, finally, that, the Circuit Court, having full jurisdiction in the premises, its finding of the fact of disobedience is not open to review on *habeas corpus* in this or any other court. *Ex parte Watkins*, 3 Pet. 193; *Ex parte Yarbrough*, 110 U. S. 651; *Ex parte Terry*, 128 U. S. 289, 305; *In re Swan*, 150 U. S. 637; *United States* v. *Pridgeon*, 153 U. S. 48.

We enter into no examination of the act of July 2, 1890, c. 647, 26 Stat. 209, upon which the Circuit Court relied mainly to sustain its jurisdiction. It must not be understood from this that we dissent from the conclusions of that court in reference to the scope of the act, but simply that we prefer to rest our judgment on the broader ground which has been discussed in this opinion, believing it of importance that the principles underlying it should be fully stated and affirmed.

The petition for a writ of *habeas corpus* is

*Denied.*