**REINECKE COAL MIN. CO. v. WOOD et al.**

(Circuit Court, W. D. Kentucky. December 23, 1901.)

1. RES-JUDICATA—ORDER REFUSING PRELIMINARY INJUNCTION—PARTIES.

An order of a state court refusing a preliminary injunction in a suit brought by a number of corporations jointly, in which no final judgment has been rendered, is not a bar to a subsequent suit in a federal court for an injunction by a successor to one of such corporations, which was not a party to the former suit, and against defendants for the most part

different, and where the acts alleged as grounds for relief were committed after the former order was entered, although they are of the same general character as those relied on in the state court.

2. Injunction — Unlawful Acts by Labor Union—Maintaining Armed Camps.

At the instance of coal miners in Indiana and Illinois who were members of the organization known as the United Mine Workers, such organization undertook to secure the adoption of a certain scale of wages, which it had fixed, in the mines of Kentucky. Certain of the operators there, who employed union miners, agreed to adopt such scale, provided it was also adopted in a majority of the mines in another mining district of the state, in which the miners were nonunion men. The relations between the latter and their employers were harmonious, and the wages paid satisfactory; and, for the most part, they did not desire to join the union. Under such circumstances, defendants and others, representing the miners' organization, invaded the district in large force, and established camps of armed men near the mines, for the purpose of threatening and compelling the miners therein to join the union by a display of force, and of compelling a strike unless the union scale of wages was adopted. These camps were maintained for many months, the occupants threatening and even assaulting miners who refused to join the union. Both employers and miners resented such actions, and took measures of defense and retaliation; the result being conflicts and acts of violence. *Held*, that the acts of defendants and their associates in establishing and maintaining such camps constituted an unlawful invasion of the rights of both mine owners and miners, which resulted in and threatened irreparable injury, and that it was the duty of a court to enjoin the same on application by a mine owner affected.

In Equity. On motion for preliminary injunction.

Helm, Bruce & Helm and Gordon & Gordon, for complainant.

W. H. Yost, R. Y. Thomas, Jr., and Everett Jennings, for defendants.

EVANS, District Judge. The complainant corporation, a citizen of the state of Delaware, which owns and operates a large coal mine in Hopkins county, Ky., on November 12, 1901, exhibited its bill of complaint against certain persons belonging to an association known as the United Mine Workers of America; some of the defendants being officers of a section of that organization. The organization is a labor union association, and the bill complains of certain acts of the defendants by which it is alleged that the property of the complainant is threatened with great and irreparable injury, and seeks such relief as it may be in the power of the court to give. Upon the institution of the action a temporary restraining order was granted by the judge, and the pending motion was subsequently made for an injunction pendente lite according to the prayer of the bill. By certain parts of the answer of the defendants, as amended, that motion is opposed upon the ground that the Reinecke Coal Company, a Kentucky corporation, which owned the mining property of the complainant up to the 6th day of November, 1901, and which on or about that day transferred all its property to the complainant, was the only person wronged, if any one was, by the alleged acts of the defendants, and that none of those acts in any way affected the complainant, but only its predecessor in the ownership of the property. It is, indeed, quite true that the defendants

should not be enjoined if their acts were only directed against another person than the complainant, and especially if the complainant is threatened with no injurious results from the conduct of the defendants. But the court finds from the evidence submitted to it that, while the history of the transactions in the course of which the troubles complained of arose shows that the old company was the one aimed at, yet it also shows that the results sought by the defendants cannot be accomplished without pursuing the same course towards the complainant; and the court finds from the evidence that, up to the time of the filing of the bill of complaint and the issuance of the restraining order in this case, there was no cessation of the efforts of the defendants to accomplish their designs, and that these efforts were directed against the complainant after its purchase of the mining property, and, further, that the armed camp of the defendants near complainant's mines was maintained until the restraining order was served, after which the armed persons composing that camp, in great numbers, moved upon a neighboring coal mine in Webster county, and that that movement was attended with deplorable results, which otherwise might have been inflicted upon the complainant. This is sufficient to dispose of the defendants' first objection.

A second objection made by the defendants is based upon the averment in the answer as amended to the effect, substantially, that the complainant in an action in equity brought by it in the state court in Hopkins county on the 8th day of May, 1901, sought, but was refused, an injunction by that court; it being claimed that the cause of action asserted in that case was the same as that asserted in the pending action. This, it is contended, was a judgment against the right of the complainant, which bars the granting of the injunction now prayed for. This contention is entirely without legal force or merit, for several distinct reasons, among which are: First, the fact that that suit, as shown by the copy of the record filed, was not brought by the complainant at all, but was brought by the St. Bernard Coal Company, the Reinecke Coal Company, and the Monarch Coal Company, jointly, each of which was an entity entirely different from the complainant; second, the record shows that the defendants in that case were different in most respects from the defendants in this case; third, the plaintiffs in the proceeding, so far as it was passed upon, sought a provisional remedy, only, under the Code of Practice, against the defendants in that suit, and the claim thereto was based upon grounds which differ materially from those alleged in this suit; fourth, the order refusing the temporary injunction in that case was not made as a final judgment by the court, but the provisional remedy of a temporary injunction was refused by the judge, and no final judgment appears to have been entered in the case on the merits; fifth, that action, while judicial in character, was taken in a cause to which the complainant was not a party, and, for the most part, against persons other than the defendants in this case, and manifestly upon grounds materially different from those asserted here; sixth, the preliminary refusal by the judges thus acting of merely provisional relief, upon one state

of facts,. and between different parties, would not prevent the granting of the pending motion, affecting different parties, and upon another and substantially different state of fact; seventh, the refusal of an injunction to the Reinecke Coal Company to restrain acts directed against that company alone, or jointly with others, would not affect the right of the complainant to the relief sought against acts directed against it, especially when those acts occurred after its purchase of the property of the older corporation; and, eighth, to be a bar, there must have been a judgment, in the technical sense, and in a suit to which the complainant was either a party, or to the judgment in which he was privy.

The trouble in the coal mining region in Hopkins, Webster, and Christian counties, and which, for convenience, will hereinafter be called the "Hopkins County District," and which have obtained such wide and unwholesome notoriety, arose some 18 months ago, out of a state of facts which is briefly as follows: Certain miners in Indiana and Illinois, belonging to labor unions there, complained that certain miners belonging to similar associations in Kentucky were not being paid wages according to a scale fixed in Indianapolis, and that therefore there was great danger that they could not themselves maintain that scale. This complaint resulted in the conception of a plan and purpose to remedy what they ·considered an unsatisfactory condition of things. Agents were thereupon sent to certain parts of Kentucky to bring about an increase of the pay of the miners there. As a result of this, an agreement was reached with the operators at certain localities—notably, at Central City—who employed laborers belonging to the union, and these operators consented to advance their scale of wages upon condition that a certain per cent. of the operators in the western Kentucky coal fields would do the like; and this agreement has probably been one of the most fruitful sources of all the subsequent troubles, all of which grew out of the attempts of the United Mine Workers to coerce the consent of the necessary percentage of the other operators to put in force the agreement made at Central City. In the Hopkins county district large mines were being very successfully conducted with nonunion labor, and both employers and employés were not only prospering, but were mutually entirely ·satisfied. In order to carry into effect the agreement referred to, it was thought essential to disrupt those cordial and satisfactory relations between the non-union laborers and their employers in the Hopkins county district, and by compelling the former to join the association of United Mine Workers the latter would be forçed to yield to the Indianapolis scale of prices, and thus effectuate the agreement made by the union miners with the operators at Central City and elsewhere in the western Kentucky coal fields. In order to compel (for that is not too strong a word) the miners in the Hopkins county district to join the United Mine Workers, and the operators there to consent to their so doing, and thus bring about the adoption and secure the maintenance of the Indianapolis scale ·of wages, which neither the employers nor employés in the Hopkins county district desired, and which was probably not suitable to the conditions there,

the United Mine Workers, and particularly the defendants, invaded the Hopkins county district in large force, and, having formed an armed camp, occasionally sallied forth to threaten and sometimes to do much worse to, persons who refused to join their organization, and to those who refused to employ laborers who did join it. This conduct upon their part naturally superinduced measures of defense and retaliation upon the other side, and there has resulted from these circumstances and conditions the very remarkable state of affairs to which reference has been made,—a condition of things which has certainly brought discredit upon the state. To tolerate such a condition is to encourage it, and, without hesitation, the judge of this court granted the restraining order when it was asked in this case; and one gratifying thing disclosed by the evidence offered on this motion is that much good has probably resulted from that action, although it did not prevent the assault by the United Mine Workers upon property and citizens in Webster county immediately afterwards.

A great number of affidavits were filed at the hearing, and have been read; and, while much very positive conflict of statement has been found in them, enough appears to warrant the conclusion that, as a direct result of their agreement with the Central City operators and others, the United Mine Workers organization determined to make what is somewhat remarkably called a "striking district" out of that portion of the territory of Hopkins, Christian, and Webster counties where coal mining is carried on, and to force the operators there to yield to their demands by means of the terror inspired by the tactics adopted and tenaciously pursued, of having a large force encamped in the immediate neighborhood of the mines in that territory, and, by the feelings to be thus excited and the terror to be thus inspired, to compel nonunion labor employed there to join the United Mine Workers, and thereafter to strike if the Indianapolis scale of prices was not adopted by their employers. There was no strike then or since pending at any of the mines in the Hopkins county district. There appears to have been little or no discontent among the laborers employed there. The scale of prices under which they were working was satisfactory to most, if not all, of them, and to those who employed and paid them. They did not at that time, in any large numbers, appear to desire to join any union, and the subsequent presence of the armed camp could in no way benefit them. The whole scheme was to benefit another certain class of miners, not resident in that district, and who worked elsewhere, by forcing the operators in the Hopkins county district to do what neither themselves nor their employés desired to do. If we agree that the mine owners in what we may briefly call the "Central City District" were not particeps criminis to all the troubles in the Hopkins county district, and responsible equally with their co-contractors for the results of the encampments and of the armed and unlawful operations there, we must nevertheless conclude that their contract with the labor unions, to which we have referred, was the direct cause of the invasion of that district, and the terrorizing attempt made there to put that agreement into effective operation;

112 F.—31

they in the meantime being exempt alike from similar assaults and from the Indianapolis scale of wages. As before stated, there was little or no discontent in the Hopkins county district. There was no request nor desire, so far as the evidence shows, for the aid of the labor association known as the United Mine Workers. On the contrary, it was undesired and vigorously repelled both by the employers and a vast majority of the employés. Nevertheless the defendants and those associated with them determined to bring these unwilling persons to the terms the defendants desired to dictate, and, with that sole object in view, organized the armed camp near Madisonville, and one near complainants' mines, and in this way sought to accomplish their own selfish objects at any cost. This, as already intimated, was mostly done before the complainant owned its property, but the object was not accomplished, and the effort was continued in the same way and by the same means until this suit was actually brought. It cannot be that this course was not meant to be an attempt to compel the complainant, by force and intimidation, to yield to the defendants' wishes and demands. The encampment of armed men in the vicinity of the mines was not meant for gentle persuasion or peaceable argument. Peaceable and argumentative persuasion is entirely admissible, but is not accomplished nor intended to be accomplished in that manner. The conduct of the defendants, on the contrary, had all the elements of terror and intimidation; and those elements, being intentionally present, were indubitably designed to compel the complainant to accede to demands it had the lawful right to decline or reject at its option. A court cannot shut its eyes to propositions so palpable. The right to employ whom one wishes, the correlative right to hire to whom one pleases, for wages satisfactory to both, and the right of the same parties to abandon or dissolve the relations thus assumed, are undeniable. The right of each party to strive to obtain the terms most beneficial to himself, and the right of a number of persons similarly situated to unite to accomplish such ends, must be admitted by all. And it follows as a resultant from the latter proposition that individuals having similar interests may by all peaceable and argumentative means persuade others to join with them in their efforts to do what they fairly consider to be beneficial to themselves as a class, but the safety and preservation of these great and inestimable rights in a free country depend in no small degree upon their recognition and upon their being respected by all persons alike. They are rights which belong to all in common, and not to one class only. The employer and the employé, in whatever business they may be engaged, either in plain merchandising or farming, or in conducting the most extensive manufacturing or other business, must have rights which are equal; and both sides must understand, must respect, and must act upon that principle whenever it applies. When either side to a contention over diverse interests of this character can, by superior force or other means of intimidation, compel the other side to such controversy to yield to its demands, anarchy and oppression have begun, and there is no assurance that in the next encounter the other side may not be

the victors, and thus might and force and power, instead of just legal principles, may dictate the standard of right to which all must conform. The only course that is safe for all—the few or the many, the weak or the powerful—is rigorously to require that each party to all such controversies shall recognize the equal rights of all. It is the duty of the courts, upon all proper occasions, to see that this is done, and to apply these principles in all cases that come before them. With this rule as a guide, there is no difficulty in solving the problem presented by the record in this case. The employer and (in the main) the employés in this instance were alike content. They must be presumed to have understood their own condition and needs, and what was best for themselves; and they were not required to subordinate their interests or their wishes to those of miners in distant localities or states, where what might be entirely different conditions would make the Indianapolis scale of wages more equitable and proper for those who desired to adopt it. They had the right to be left free to pursue their own course about matters exclusively of their own concern. The agreement between the laborer and the employer was one which it was the mutual right of both to make, and one which constituted a material and valuable interest in both, and one in which they had the right not to be disturbed by persons who clearly had no right to do so either by force, or by the appearance of force, nor by any threats or other forms of intimidation. This right thus possessed was a valuable property right,—valuable to the laborer, but none the less so to the employer. The intrusion of the defendants, so long as mere peaceful argument and persuasion were used, was in no way violative of the rights of the complainant; but, when that persuasion took the form of the multitudinous camp and the gun and the pistol and the armed force, it passed the bounds of legal right, and entitled the complainant to its lawful remedies against it, quite as much, to say the least, as "picketing," or "besetting," which are held to be a nuisance, and suppressible as such. If picketing may be so treated, then a fortiori the conduct of the defendants should be prohibited. If this court cannot, in a case like this, protect the rights of a citizen when assailed as those of the complainant have been in this instance, there is a decrepitude in judicial power which would be mortifying to every thoughtful man. It is conceived that there is no such impotency, and there should be no lack of promptness in exercising in the premises all the power the court possesses. Quite true it may be that the exertion of executive power would be more desirable in cases like this, but that abstract proposition in no wise exempts the court from the duty of protecting the rights of the litigant when a proper case is presented. It has not been deemed useful to cite authorities in support of principles so well settled as those upon which the court must proceed in this case, but it may be well to mention the cases of In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092, and Quinn v. Leatham, [1901] App. Cas. 495, as covering the whole ground.

As already intimated, the court has not failed to notice the extreme conflict in the testimony presented by the respective sides,

and an attempt to reconcile those conflicts would obviously be unavailing. It may not be inappropriate, however, to say that the statement so positively made in the affidavit of one of the chief officers of the local association of United Mine Workers to the effect that Henry Taylor was murdered in cold blood is so palpably refuted and shown to be so utterly false by the record, and by the court of appeals in its decision in the proceedings which resulted from that unfortunate event, that discredit is thrown upon the equally positive statements made in the other affidavits. A careful consideration of the testimony leaves the court in no doubt that the averments of the bill are substantially true, and, this being so, the motion for the injunction pendente lite will be sustained, in order to prevent great and probably irreparable injury. The testimony also leaves upon the mind of the court, as before stated, the pleasurable assurance that the temporary restraining order has been productive of good; and, if this be so, the court should hesitate to do anything to destroy or impair that beneficial result.

The motion for an injunction pendente lite according to the prayer of the bill is sustained, and counsel will prepare and submit proper orders to that effect.