## UNITED STATES v. TALIAFERRO.

(District Court, W. D. Virginia. October 2, 1922.)

1. Injunction ⊜⟹223(2)—Posting placard held violation of strike injunction; "associated."

　　The acceptance by respondent from strikers during a railroad strike, and the posting or permitting to be posted in a conspicuous place in the front window of his barber shop, facing a main street near an entrance to a railroad building, a conspicuous placard with large letters reading, "No scabs wanted in here," held a violation of an order enjoining the strikers and "all persons conspiring or 'associated' with them" from interfering with, annoying, or insulting employees of the company about the premises or on their way to or from their work, and failure to remove said placard after service of the injunction order held a contempt of court.

　　[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Associate.]

**2. Injunction ⬯230(3)—Violation of strike injunction may be shown by circumstantial evidence.**

Contempt may be proved by circumstantial evidence, and evidence that employees of the railroad company passed along the street in front of respondent's shop, going to and from their work, is sufficient to show that they saw and were annoyed and insulted by the placard, which remained in the window for nearly two months.

**3. Courts ⬯262(4)—Federal court may enjoin interference with employees of interstate carrier.**

Under its power to enjoin acts which restrain interstate commerce a federal court may enjoin acts which may interfere with the working of numbers of the employees of an interstate carrier during a widespread strike.

**4. Jury ⬯13(21)—Respondent in contempt proceeding held not entitled to jury trial.**

A charge of contempt in violating an injunction by displaying in a shop window a placard calculated to annoy or insult railroad employees passing to and from work *held* not to involve a criminal offense, which entitled respondent to a jury trial, under Clayton Act Oct. 15, 1914, § 22 (Comp. St. § 1245b).

**5. Jury ⬯13(21)—Whether respondent is entitled to a jury trial is to be determined from the charge made against him.**

Whether a person proceeded against for contempt is entitled to a jury trial, under Clayton Act Oct. 15, 1914, § 22 (Comp. St. § 1245b), is to be determined from the charge made, and not from the evidence introduced on the trial.

**6. Jury ⬯13(21)—Right to jury trial for contempt limited to cases where criminal offense is charged.**

The right to a jury trial for contempt, given by Clayton Act Oct. 15, 1914, § 22 (Comp. St. § 1245b), is limited to the cases specified in section 21 (Comp. St. § 1245a), where the acts charged constitute a criminal offense.

**7. Injunction ⬯101(3)—Clayton Act does not prohibit injunction forbidding calling working employees "scabs."**

Clayton Act Oct. 15, 1914, § 20 (Comp. St. § 1243d), does not prohibit the granting of an injunction forbidding the use of insulting epithets, such as "scab."

Proceeding for contempt by the United States against L. A. Taliaferro. Defendant adjudged in contempt.

Judgment affirmed 290 Fed. 906.

L. P. Summers, U. S. Atty., of Abingdon, Va., and C. E. Gentry, Asst. U. S. Atty., of Charlottesville, Va.

Oliver B. Harvey, of Clifton Forge, Va., for defendant.

McDOWELL, District Judge. At the time shown therein the following order was made:

"In the United States District Court for the Western District of Virginia, Continued and Held at Lynchburg, on September 2, 1922. Order for Attachment.

"Whereas, in the equity cause pending in this court at Lynchburg, entitled 'Chesapeake & Ohio Ry. Co. v. Brotherhood of Railway & Steamship Clerks, etc., et al., No. 256,' an injunction order was issued on the 5th day of August, 1922, which has been in effect ever since;

"And whereas, in the equity cause pending in this court at Lynchburg, entitled 'Chesapeake & Ohio Ry. Co. v. International Association of Machinists

et al.,' an injunction order was issued on the 5th day of August, 1922, which has been in effect ever since;

"And whereas, in both of said injunction orders certain named organizations, and the officers, agents, and members thereof, and also certain named individuals, and all persons conspiring or associated with them, are, in substantially the same terms, enjoined from abusing, intimidating, molesting, annoying, or insulting any person in or desiring to enter the employ of the aforesaid railway company on their way to or from their work or while engaged in any service of or for said railway company;

"And whereas, it has been by the affidavits of Deputy Marshals Chas. C. Willoughby, W. W. Rangeley, and W. B. Slusser, laid before this court and now filed in the clerk's office at Lynchburg, made to appear that one L. A. Taliaferro, of Clifton Forge, Virginia, did on August 29, 1922, permit to be publicly and conspicuously displayed, in his barber shop, on Main street in Clifton Forge, Virginia, known as the 'Ideal Barber Shop,' a placard printed in conspicuous type, reading : 'No Scabs Wanted in Here;' that on said day the said Taliaferro was clearly given to understand by Deputy Marshal W. B. Slusser, as well as by others, that allowing said placard to be publicly displayed in said shop was a violation of said injunctions, and was served with a copy of the above-mentioned injunction order in case No. 256 above mentioned;

"And whereas, it is further made to appear by certain additional affidavits by W. B. Slusser and W. W. Rangeley and C. C. Willoughby, also filed, that, notwithstanding the service of said order and the information given him on August 29, 1922, the said Taliaferro continued to leave publicly and conspicuously displayed said placard in his aforesaid barber shop, on August 30 and August 31, 1922:

"It is therefore ordered that a writ of attachment be forthwith issued, commanding the marshal of this district and his deputies to attach the said L. A. Taliaferro, if he be found in this district, and to have his body before this court at Lynchburg, Virginia, at 10:30 a. m. of September 8, 1922, to stand trial upon the charge of contempt set out in this order, and to show cause, if any he has, why the said Taliaferro should not be punished therefor, and further commanding that a copy of this order be served on the said Taliaferro at the time he is arrested.

"And in the body of said attachment the clerk will insert a direction to the officer executing said writ to take the defendant (if the defendant so desires) before the nearest United States commissioner of this district, in order that said defendant may, if able, give security for his appearance before this court at the time and place in this order set for the aforesaid trial.

"The said clerk will also transmit to the marshal, with an original and an attested copy of said attachment, two attested copies of this order."

The attachment issued under the above order was as follows:

"United States of America v. L. A. Taliaferro. Attachment.

"United States of America, Western District of Virginia.

"The President of the United States of America to the Marshal of the Western District of Virginia—Greeting:

"Pursuant to an order of court of this date, entitled as above, these are to command you and your deputies to attach the body of L. A. Taliaferro, if he be found in your bailiwick, and him safely keep, so that you have him before the judge of the United States District Court for the Western District of Virginia at Lynchburg, at 10:30 a. m. on September 8, 1922, to stand trial for the alleged contempt set out in the aforesaid order, and further to do and receive what the said court shall in that behalf consider.

"You will further deliver to the said L. A. Taliaferro, as soon as may be after arresting him hereunder, a duly attested copy of the above-mentioned order of court, to the end that he may seasonably learn the charge made against him.

"You will also, upon arresting the said defendant, if he so desires, carry him before the nearest United States commissioner in this district, in order that

the said defendant may be bailed for his appearance before the said judge of the said court at the time and place of trial above set out. ·

"And how you have executed this writ you will make return on or before the day and hour herein last above mentioned."

The defendant was promptly arrested, and at the same time was served with a copy of the foregoing order. He gave bond before the nearest United States commissioner and appeared at Lynchburg at the time set for the trial. The defendant demurred, and, when his demurrer was overruled, answered. The following opinion sufficiently shows the nature of the evidence introduced and the contentions made in behalf of the defendant:

The order directing the issue of the attachment sets out the charge made against the defendant.

1. It is first argued that the defendant was not associated with any of the members of any of the labor unions mentioned in either of the injunction orders. In case 256, Chesapeake & Ohio R. Co. v. Brotherhood, etc., the injunction order (dated August 5, 1922) reads in part as follows:

" * * * That the defendants above named [a dozen individuals, and the Brotherhood of Railway and Steamship Clerks, Freight Handlers and Express and Station Employees] and the officers, agents, and *members of said organization* defendant, * * * *and all persons* conspiring or *associated with* them, * * * be and they *are hereby enjoined* * * * from following in parties of more than two persons and importuning * * * *those in or desiring to enter the employ of the complainant* about the premises, or about the streets and places aforesaid, and *on their way to or from their work* for the complainant, or engaged in any service of or for the complainant, * * * from * * * *abusing, intimidating, molesting, annoying, insulting, or interfering with such* persons or any of them. * * * *"

In case 257 (Chesapeake & Ohio Ry. Co. v. International Association of Machinists et al.) the numerous labor unions and individuals named and *"all persons conspiring or associated with them"* are enjoined from "hindering or obstructing * * * individuals desiring to enter the service of the complainant at or about said shops, roundhouses, plants, stations or premises, or *going to or from their work, or while at work in the service of the complainant,* from * * * abusing, intimidating, *molesting, annoying, insulting, or interfering with such persons or any of them.* * * *"

[1] The evidence has not yet been transcribed, but as I recall it (with the aid of my notes) the testimony was that the placard was brought to the defendant's barber shop by "a couple of strikers" and placed in the front window of the shop early in July. It remained thus displayed until about September 4, 1922. This placard, 8¾x6½ inches in size, contains the following:

NO SCABS

WANTED IN HERE.

The words "no scabs" are printed in letters 1⅜ inches in height and proportionately broad; the balance of the legend being in letters ¾ of an inch in height. By actual demonstration I find that I can easily read the larger letters at a distance of 75 feet and the smaller ones at 50 feet. The clerk of the court reads the larger let-

ters at 100 feet and the smaller ones at 90 feet. The defendant's barber shop was on East Main street, in Clifton Forge, Va., about 125 feet from one of the entrances to the railway company's freight house, and many of the clerks who were working at the freight house passed by the barber shop daily on the way to and from their work.

It seems to me that the defendant "associated" himself with the members of the labor unions on strike when he maintained in his front window the placard brought there by some of the strikers, and especially when (on August 29th) he refused to take the placard down, and maintained it on August 30th and 31st after having been told by three different deputy marshals that in so doing he was in contempt of court. In so doing the defendant allied himself with—became associated with—the strikers. There is, I think, a rather fine distinction between conspiring with and associating oneself with. The evidence at least clearly shows that the defendant associated himself with the strikers in doing the act charged.

2. The charge that the defendant intimidated any of the working employees has not been proved. But the defendant is also charged with molesting, annoying, and insulting. It is matter of common knowledge that the word "scab," as a designation of a human being, is one of the most opprobrious and insulting in the English language. One of the common literal meanings is (Webster's Internat'l Dict., Ed. 1922):

"An incrustation over a sore or pustule formed by the drying up of the discharge from the diseased part."

Other and less literal, but (in times of strike) extremely common, meanings are:

"A dirty, paltry fellow."
"A workman who works for lower wages than, or under conditions contrary to, those prescribed by the trade union; also, one who takes the place of a workman on a strike; a rat; used opprobriously by trade unionists."
Webster's Dict. 1922.

No man can be called a scab without thought of the putrescent and loathsome object which the term applied to himself suggests. Testimony from any one or more of the employees that being publicly excluded from a public place by a most highy offensive designation was annoying and insulting would have been supererogatory. Even judges are not justified in refusing to act on knowledge which is common to practically all sane and adult inhabitants of the United States.

[2] 3. Counsel for defendant relies strongly on a supposed want of evidence that any employee was insulted or annoyed by the placard, or that any such person even ever saw the placard. Contempt can, of course, be proved by circumstantial evidence; and the circumstances proved and admitted in this case have convinced me beyond all reasonable doubt that those of the employees who worked at the freight house, and who went by the defendant's shop daily on the way to and from their work, must have seen the placard frequently, and, being human, if they saw it, they were insulted, molested, and annoyed by it. The admission on this subject, as sent to me by the stenographer in advance of the transcript, is:

"It is admitted by the defendant that employees of the railway company who work in the freight service do pass the Ideal Barber Shop coming to and from their work, and have since the date of the injunction up to the present."

Mr. Harvey then made the following statement:

"The statement by counsel for the defendant is made from considerably greater knowledge of local conditions than is possessed by the defendant, who is himself a resident of Staunton. The admission is not, therefore, to be considered contradictory of anything said by the defendant, and is made simply because it is a fact, and could be proved by delaying the case and sending for witnesses familiar with the situation."

In no case does the law require absolute certainty, nor does it require proof beyond all possibility of mistake. The supposition that a number of freight clerks could every day for about 60 days, during an intense and bitter strike, pass by the front window of a barber shop in which the placard in question was conspicuously displayed, without some of them seeing it, is not a reasonable hypothesis. The possibility that none of the employees saw the placard is so highly improbable, so contrary to human experience, that I cannot and do not entertain any reasonable doubt about the matter. To be denied access to a public barber shop maintained for white men is of itself highly insulting to any white man. If even a single individual among the employees in the freight service saw the placard, it is almost inconceivable that he did not quickly spread the news among his fellows. I find it impossible to doubt, reasonably, that some of the employees saw and were annoyed and insulted by the presence of the placard in the shop window. And if any of them even heard of it they would have been necessarily annoyed by it.

It has not been, but may be, argued that there is no evidence that any of the employees in the freight service were insulted or annoyed by the presence of the placard in the shop window on August 30th and 31st, the dates particularly mentioned in the charge. As has been said, some (probably all) of the employees who passed the defendant's shop daily must in reason have learned of the presence of the placard, have seen it, and have been annoyed and insulted by it, during the nearly two months of its public exhibition prior to August 30th. If so, the mere continuance of the public display of the placard violated both the letter and the spirit of the injunction orders.

4. The defendant, admitting that his sympathies were with the strikers, said that he had maintained the placard in his window in order to prevent strikers and strikebreakers from meeting in his shop. I assume that there is no power in this court to compel a barber of union sympathies to work for strikebreakers. And if the defendant had posted a sign reading that he desired to serve strikers only, or that he did not desire to serve nonunion men, the case would have been very different. But the defendant (being sane and adult) necessarily knew, when he first saw the placard, that its words would deeply wound the feelings of the nonunion employees. I cannot perceive that the purpose to prevent meetings of members of the rival factions could properly be so carried out as to unnecessarily insult and

annoy those who were intended to be protected by the injunction orders, at least after knowledge of the terms of the orders.

[3] 5. It is contended that this court had authority to enjoin only acts which restrained interstate commerce. Admitting that the court could restrain only those acts which tend, and not too remotely tend, to restrict interstate transportation (or to retard the passage of the mails), it seems to me that the act of molesting, annoying, and insulting numbers of those who are working for, or are desirous of working for, an interstate carrier, during a widespread strike, has an all-sufficient tendency to restrict interstate transportation (and to retard the mails) to fully justify an injunction. The propriety of enjoining the maintenance of pickets composed of more than one person has been settled. American Steel Foundries v. Tri-City, etc., Council, (Dec. 5, 1921) 257 U. S. 184, 42 Sup. Ct. 72, 66 L. Ed. 189. The difference in principle between enjoining strikers from maintaining pickets composed of several persons, and enjoining them from molesting, annoying, and insulting working employees, is rather too fine for practical use.

In this connection it may be advisable to say that the authority for the issue of the injunctions here in question is found in sections 1 and 4 of the Sherman Anti-Trust Act of July 2, 1890, c. 647, 26 Stat. 209 (Comp. St. §§ 8820, 8823), section 291, Judicial Code (Comp. St. § 1268), and section 16 of the Clayton Act of October 15, 1914, c. 323, 38 Stat. 730, 737 (Comp. St. § 8835o). Section 20 of the Clayton Act (38 Stat. 738 [Comp. St. § 1243d]) does not forbid injunctions in strike cases when "necessary to prevent irreparable injury to property, or to a property right." That the right to carry on interstate transportation, and the right to transport the mails, are property rights, need not be argued.

[4, 5] 6. The contention that the defendant was entitled to a jury trial next calls for consideration. Sections 21 and 22 of the Clayton Act, supra (38 Stat. 738 [Comp. St. §§ 1245a, 1245b]), require a jury trial on the demand of the defendant, if the act charged to be a contempt is "a criminal offense under any statute of the United States, or under the laws of any state in which the act was committed." It goes without saying that the intent of this statutory provision is that the right to a jury trial on a charge of contempt shall be determined from the charge made, and not from the evidence introduced on the trial. The method of trial must, of course, be determined before the trial is commenced and before evidence is heard. It follows that, if the charge is not that of the commission of a crime, the court cannot properly evade its own duty and grant a demand for a jury trial. The charge set out in the order for the issue of the attachment, and served on the defendant, is that he violated the injunction orders on August 30th and 31st, in that he continued to publicly display on those days the insulting placard. It is not a crime, state or federal, to molest or annoy, or (in the way here charged) to insult or intimidate, a class of persons. There is a state statute (section 4536, Code 1919) against using abusive language; but it in terms applies only to spoken abuse, and, being a criminal statute, must be

strictly construed. To wound the sensibilities of another person, as was done by the defendant, is a moral offense (and a violation of the injunction), but not a crime. I can think of no reason why the court, in the injunction orders here, could not have validly in express terms forbidden that any member of any of the named organizations and any person associated with them should publicly display any written or printed placard which refers to the working employees as "scabs." Violating such clause of an injunction order certainly would not be a criminal offense, in the sense in which the words are used in section 21 of the Clayton Act.

It may be contended that the defendant is charged with conspiring to violate the injunction. I do not think he is so charged; but, if so, he is charged with conspiring with others to leave on public display the insulting placard in question, and "conspiring"—that is, agreeing—to do this act is not a crime. It goes without saying that there is no crime against the state of Virginia in agreeing to violate a federal injunction; and it is not a crime against the United States to so agree, simply because there is no federal statute which makes such an agreement a crime, and to authorize a jury trial of a charge of contempt it is necessary that the act charged be a criminal offense under some federal statute or under the laws of this state. It follows that, even if the evidence had shown the defendant guilty of a crime (which is not the fact), the defendant's right to demand a jury trial must have been determined with reference only to the charge made, and hence the question was correctly determined.

It may be contended that the evidence justifies an inference from the facts proved that the defendant conspired with the strikers to restrain interstate commerce, or to violate some other federal statute. If such fact be assumed, it does not give the defendant a right to a jury trial. He is not charged with having conspired to restrain commerce, or with having conspired to violate any federal statute. But if the recital in the charge as to those who are within the inhibitions of the injunction orders could be treated as charging that the defendant conspired with some member or members of some labor organization named in one or the other of the injunction orders, the object of the conspiracy as charged was to wound the sensibilities of the working employees, and to thus "conspire" is not a crime. It is true that the defendant is charged in the conjunctive, with insulting and intimidating the working employees; but, if it be considered that he is charged with conspiring to intimidate, he is still not charged with a crime. I so say because it is not a crime to agree with another person to intimidate a class of persons by displaying a placard which insults such class.

[6] It is argued that the intent of the Clayton Act is that all contempt charges in strike cases shall be tried by jury. Reliance is placed on section 24 of the act (38 Stat. 739 [Comp. St. § 1245d]) to sustain this contention. I can find no support for this theory in the statute anywhere. In sections 21 and 22 certain kinds of contempt charges are made triable by jury. In section 24 direct contempts and violations of orders made in cases prosecuted by or in behalf of the

government are excluded from the operation of sections 21 and 22, and section 24 concludes with these words:

" * * * And all other cases of contempt not specifically embraced within section twenty-one of this act may be punished in conformity to the usages at law and in equity now prevailing."

A reading of the entire statute, and especially of sections 21–25, satisfies me that we have here merely a carelessly written sentence, the meaning of which is nevertheless quite apparent. The thought was that all other cases of contempt should be tried and punished according to the old practice. However, this last clause of section 24 need not be considered. The right to a jury trial is given (section 22) only in the cases mentioned in section 21. Hence, unless the act charged be a crime, there is no possible ground for a contention that a jury trial is provided for by the Clayton Act. A statute which expressly and clearly changes the common law only in certain distinctly specified cases cannot properly be construed as applying to other cases.

The reason for the enactment of section 24 is, I think, as follows: In committing some contempts in the presence of the court, as well as in committing some contempts in violation of orders made in equity cases prosecuted by or for the government, the act done may be a crime. Such cases, if not excluded therefrom by some further provision, would by force of sections 21 and 22 be triable by jury. It would assuredly have been unwise to deprive the federal courts of their salutary power to punish forthwith and without a jury all kinds of direct contempts. In fact, it has been frequently laid down that the power of immediate punishment of contempts committed in the presence of the court is essential to the continued usefulness of the courts. With respect to indirect contempts in government cases: When the government, or an official in behalf of the government, exercises the right to have an injunction order issued, violations of such order are likely to cause great public inconvenience. Trials of indirect contempt charges held by a single judge may usually be more quickly obtained than a trial by jury. And the judge, in theory, if not in fact, is less likely to be swayed by possible temporary hostility to the policy being at the time pursued by the government, or by improper sympathy for the defendant, than a jury. The success of the government in quelling the great railroad strike of 1894 (In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092; U. S. v. Debs [C. C.] 64 Fed. 724) was most probably considerably aided by the prompt, just, and unsentimental action of Judge Woods in finding the defendants guilty and in sentencing them to spend, respectively, from 3 to 6 months in jail. It is beyond question wise, politic, salutary, that the government's ancient rights as a litigant be not impaired, even in behalf of organized labor. Private employers constitute a small fraction of our population in comparison with those represented by the government; and for this as well as for other reasons the lawmakers may have been quite willing to experiment with juries in certain kinds of contempt cases growing out of private disputes between employer and employees and wholly unwilling to

make a similar experiment in cases involving the rights of the government.

But, whatever may have been the reason or reasons for the language used in section 24, it is utterly impossible to read sections 21, 22, and 24 together, and find therein a direction to permit a jury trial, if the act done in violation of an injunction be not a crime against the common or statute law of the state or against some federal criminal statute. Sections 21 and 22 lay down a general rule, and section 24 at the most merely supplies two classes of exceptions to the general rule.

[7] 7. I think it cannot be successfully contended that section 20 of the Clayton Act prohibits an injunction which forbids strikers from insulting the working employees. It is true that that section prohibits enjoining the doing of any act or thing which might lawfully be done in the absence of the dispute which led to the issue of the injunction. To put a concrete case: Was it the intention of Congress to authorize strikers to call the workers scabs? There are a few epithets more likely to bring about an immediate breach of the peace, and section 20 was emphatically and distinctly intended to authorize only peaceful methods of conducting a strike or a boycott. However, the topic need not be pursued. It is inconceivable that Congress intended to legalize, especially during periods of intense and bitter feeling, the use of insulting epithets. And to publicly display a printed placard applying a highly offensive word to a considerable number of people is only another form of using insulting epithets.

8. I see no sufficient reason for not holding the defendant guilty. At least after August 29th, he is conclusively presumed to have known that the injunction orders forbade him from maintaining the placard on public display. If it be thought that the repeated warnings by the deputy marshals were insufficient to put the defendant on notice, certainly the formal, official service of one of the injunction orders on the defendant did put him on notice.

A fine of $200 will be imposed.