## UNITED STATES v. CUNNINGHAM.

District Court, D. Nebraska, Chadron Division.
August 10, 1929.

No. 48.

James C. Kinsler, U. S. Atty., of Omaha, Neb.

J. M. Fitzgerald and L. L. Raymond, both of Scottsbluff, Neb., for defendant.

WOODROUGH, District Judge. The government filed a bill in equity in this case charging that defendant had bootlegged liquor at times and places specified, and praying a personal injunction against him. The case was laid upon section 23 of title 2 of the National Prohibition Act (27 USCA § 35). I held on motion [21 F.(2d) 800] that, in so far as the act intends to and does provide a means to punish the defendant for a crime without trial by jury, it is unconstitutional (27 USCA § 38). Thereafter the bill in equity was amended by adding subsequent acts of bootlegging to the charge. It is argued for the government that my decision was wrong, and that authoritative adjudication is to the contrary, particularly the cases cited in U. S. v. Lockhart (D. C.) 33 F.(2d) 597. The matter is accordingly reviewed.

On the former hearing I cited no precedents, because it appeared to me there were none applicable and controlling. I simply applied the constitutional provision that the trial of all crimes shall be by jury to the attempt presented to have the man tried and ultimately imprisoned without a jury. Since then it is reasoned in U. S. v. Lockhart that the thing can be done, not only as to the crimes included in the vernacular term "bootlegging," but as to any other crime. As I follow the argument the matter is entirely within the discretion of the Legislature, and it may as to any crime, either by calling it a nuisance or without so doing, provide procedure for imprisonment of criminals without jury trials by equity process. A trial and acquittal by jury is to afford no protection against this equity process. Jury trial guaranteed by the Constitution as a bulwark of liberty, and a shield against the oppression of government, simply fades out of the picture. I concede an antagonism to the conclusion and a predilection to adhere to the plain mandate, "The trial of all crimes shall be by jury." Nor do I recognize the authority cited from some of the courts of the states as controlling upon this court. I purposely ruled in this case on the former hearing so that the record presented a question for review directly by the Supreme Court of the United States, but the review was not taken by the law officers of the government.

I do not find that the Supreme Court has approved this proceeding or ever considered it. The statute on which this case proceeds says that the judge may inquire whether the accused has committed any of the criminal acts included in bootlegging within sixty days before the bill was filed. If the judge thinks the defendant is guilty, regardless of what a jury might have said in the matter, the judge shall lay perpetual injunction upon him, and thereafter during the natural life of the accused, if the judge thinks the man has offended again. the judge shall imprison him. There runs through the act the idea that the man himself, the human being, is a nuisance, and so beyond the pale of the right to jury trial.

It is asserted there is analogy to be found in the equity powers of the courts granted by the Sherman Anti-Trust Act, the Clayton Act, and the Wilson Tariff Act. I find none. The purpose of the Sherman Act is to protect the national trade and commerce against unlawful restraints and monopolies, and strictly preventive powers to accomplish the purpose are lodged in the equity courts. Those courts are empowered at the instance of the government to proceed according to the usage and practice of equity to determine whether the flow of trade and commerce is threatened with such unlawful restraints and to safeguard such flow of commerce against them with ordinary equity writs. Whether individual persons have or have not committed crimes at some times before the bill was filed are mere incidental inquiries. Neither in the contemplation of Congress nor in practical working out of the legislation are the equity powers to be used merely as easier means of getting persons into jail without

350

jury trials. Such is the obvious and plain purpose of this statute as to bootleggers, and there is no other purpose. There is no uncertainty, vagueness, or intricacy about acts of bootlegging—no resemblance whatever to those involved misuses of men, money, and property that go to make up wrongful monopoly. There is no real analogy between the governmental problem of jailing individual bootleggers and the problem of protecting a particular commerce against monopolistic combinations in restraint of trade. The latter problem is in the field of equity jurisprudence. The former is for the criminal courts. As to the bootlegger, the sole inquiry under this statute is, "Did the accused commit the crime at such and such a time and place?" If so, the inquiry ends, and the judge acts. On the subsequent proceedings the same inquiry again comes up, and again the judge acts. But in the inquiry as to an alleged threat against the national commerce, whether such and such a person committed a crime or not may cut no figure in the outcome, "injunction granted or denied." It is incidental and collateral.

Exactly the same considerations apply to the Clayton Act and the Wilson Tariff Act. The equity courts are empowered to and do proceed strictly in accordance with the usages and practices of equity to ascertain and to avert threatened injury to public and private right defined in these acts. The courts ascertain from evidence what it is that those named in the bill contemplate doing; how their purposes square with the public and private right and with the law. They prick out the conduct that is permissible, and they enjoin that which is threatened in contravention. But they do not put men on trial for crime, and no such purpose is found in the acts referred to; whereas such is the sole and only purpose of this statute against bootleggers.

In Lockhart's Case it is declared a misconception to say these proceedings now in question present a case for the trial of a crime. I submit it is a misconception to say anything else, and that the very cases cited for the text confirm me. None of them present such a situation as this. All of them are real cases in equity "for prevention," not punishment. This one alone is for punishment and not for prevention. In all of them you have present the means, the properties, the contracts and combinations, upon which equity lays hold to effectuate its preventive powers. Here you have only criminals to be threatened and criminals to be jailed.

The cases from the Supreme Court where equity powers to suppress liquor traffic are considered by that court according to the citations in Lockhart's Case are Mugler v. Kansas, 123 U. S. 623, 8 S. Ct. 273, 31 L. Ed. 205; Murphy v. U. S., 272 U. S. 630, 47 S. Ct. 218, 71 L. Ed. 446; Grosfield v. U. S., 276 U. S. 494, 48 S. Ct. 329, 72 L. Ed. 670, 59 A. L. R. 620; Duignan v. U. S., 274 U. S. 195, 47 S. Ct. 566, 71 L. Ed. 996.

In Mugler v. Kansas, the defendant had a distillery which under the pleadings he was proposing to put into operation contrary to law, and at the instance of the state of Kansas he was prevented by injunctional court order. I have elsewhere considered the case and found it to have no bearing here. In Murphy's Case, the padlocking by equity courts of premises where liquor was sold and which had become a nuisance was sanctioned by the Supreme Court. The court put to itself the question what the padlock section of the Prohibition Act was intended to accomplish, and said: "It appears to us that the purpose is prevention, not a second punishment that could not be inflicted after acquittal from the first. This seems to us to be shown by the whole scope of the section as well as by the unreasonableness of interpreting it as intended to accomplish a plainly unconstitutional result. The imperative words go only to the immediate stopping of what is clearly a nuisance." Thus the Supreme Court looked for the real purpose of the statute, and found it within the province of the equity court to carry out such a purpose. The fair inference is that, if Congress had attempted to confer power on an equity court to punish for crime, regardless of acquittal by jury, as this statute does, the attempt would be plainly unconstitutional.

It is equally the duty of this court to question the real purpose of this section under consideration. Of course it is in color and form preventive. The court's order directs the bootlegger not to commit certain crimes. In Lockhart's Case the order to the defendant was not to commit any in a list of a dozen crimes. The reasoning justified including any and all crimes in the calendar of crimes if Congress had so specified. But in Murphy's Case it was apparent to the Supreme Court that there was physical property, a building which was the focal point and center of a nuisance, and which the equity court could seize upon through its marshals in ordinary course of procedure, and so actually and according to ordinary practice of equity courts abate the nuisance.

So there was a real preventive purpose in the law and means of prevention at hand. In this case, on the contrary, there is no property of any kind to be subjected to the jurisdiction. There are abroad in the land some hundreds of thousands of bootleggers, individual criminals pandering each on his own account to vice. There is no handle to them that an equity court can take hold on, no property, no discernible combination of men, money, or property—foot-loose criminals. The proposition is that equity judges shall tell them individually to quit. The alleged preventive purpose is colorable merely. The real obvious purpose is to get them in jail without a jury trial. To get them into jail is a consummation devoutly to be wished, but to misuse the equity courts of the nation and to pervert their processes and destroy their dignity is serious. So far from justifying departure from the constitutional guaranty of jury trial in this case, the Murphy decision is a plain warning against such departure.

The next case cited is Duignan v. U. S., 274 U. S. 195, 47 S. Ct. 566, 71 L. Ed. 996. There the Supreme Court says no constitutional question was raised and none was considered. Following Murphy's Case, the decree abating nuisance by padlock and cancellation of the offending tenant's lease was sustained. It was a true equity decree operating through the persons enjoined upon certain property and a certain contract to be canceled. The next case is Grosfield v. U. S., 276 U. S. 494, 48 S. Ct. 329, 331, 72 L. Ed. 670, 59 A. L. R. 620. I see in it no relevancy whatever to the matter in hand. The padlock was sanctioned, but in the concluding paragraph the Supreme Court reflects its clear understanding of the possible danger to basic and fundamental property rights inhering in the padlock process. It says: "We are the more content with this conclusion since it is still within the power of the District Court to permit the. premises to be occupied or used upon the giving of a bond with sufficient surety in the amount and upon the conditions prescribed by the statute." It is indicated that the padlocking suits ought to be treated in analogy to the security to keep the peace proceedings traditionally within the justice of the peace jurisdiction.

I find no other cases in the Supreme Court claimed to present any question like that before us except In re Debs, 158 U. S. 564, 15 S. Ct. 900, 39 L. Ed. 1092. It there appeared that Debs and others were threat-ening, by combination, force, and violence, to stop the operation of the railroads at Chicago and the flow of commerce over them. At the instance of the government, the equity court threw its protecting arm about the vast properties and the commerce so menaced, and issued the writs that Debs violated. The writs were efficacious. They were backed up by force and common consent. They were true equity writs. That some of the acts threatened against the property and the commerce would have been criminal if committed as threatened was a mere incidental circumstance. All of the threatened acts and combinations were centered upon the property and the commerce carried thereby. There was specific property for the court to protect, and the equity court protected it.

Note the contrast to this case: Here it is not proposed that the equity judge throw a protecting arm about anything specific, any property, business, or contracts. He is to serve monitions upon individual criminals of a certain class and jail them for their crimes. Who thinks that when a bootlegger gets that writ he will quit for the rest of his life? The hope and expectation, and the only one, is that the man will be got into jail without the trouble of jury trial. Regard the actualities: The chancellor proceeding with the bootlegger's equity docket in a great city. "We are not trying these men for bootlegging," he solemnly declares to the sophisticated, "We are jailing and. punishing them for their disrespect of the court of equity." What they have done is to bootleg liquor. That is their crime, and everybody knows it. Nothing else will come up in a hundred of their cases. Who will misconceive what the proceedings really are that land them in jail for that crime? Who will respect the assurance that the right of jury trial for crime has been kept inviolate by the courts?

The hundred and fifty years of our history under the Constitution has been combed in Lockhart's Case to find something like the proposal of this statute. History proves that the equity courts have been guardians of constitutional rights. Nothing like this attempt to turn them to mass imprisonments without juries is found in the books.

It is said the policy of the enactment is not for the courts. Of course no equity judge wants the privilege to jail his fellow men without jury trial. The implication is that we have to. That the universal respect for equity courts so laboriously built up and maintained could not survive the spectacle of

wholesale jailings by its judges exasperated by conditions and unlimited as to their powers of punishment may be for the Legislature alone to consider, but not so the constitutional guaranty of the jury trial. It merely happens that to save this constitutional provision and the dignity of the federal courts of equity call for the same ruling in this case. That the Constitution forbids the judges to try and condemn for crime is enough. That they could not do it with dignity or effect is beside the mark. The Constitution forbids the attempt. The section has stood a dead letter in the act for ten years because it shocks common sense and common understanding of the Constitution. Nobody has misconceived what the section proposes for the equity judges to do. Everybody knows it would be suicide for their great institution to attempt it and that the Constitution forbids. This case should be dismissed because the statute is unconstitutional.

Lockhart's Case, following Cunningham's Case, reflects division of opinion in this district, contrary to Shreve v. Cheesman (C. C. A.) 69 F. 785, and it is the plain duty of the law officers of the government to review this case in the Supreme Court. Such was their duty as pointed out before Lockhart's Case was pressed for hearing contrary to the decision of this court.