# Use of Potatoes to Block the Maine-Canada Border

A number of federal statutes might justify federal intervention in the event Maine potato farmers seek to block highways at border crossings in northeastern Maine to prevent the importation of potatoes from Canada, or attack federal officers or property at the United States-Canada border. Federal intervention might take the form of direct law enforcement activity by federal executive officials, or a judicial injunction against persons seeking to obstruct the passage of interstate commerce and the mails.

In extreme situations, the President may call out the National Guard or the Army to put down rebellions in states that threaten the enforcement of federal law.

Federal law enforcement officers have no special authority to make arrests for violations of state law, and they can act in this regard only as private citizens.

The Attorney General is the chief civilian officer in charge of coordinating all federal governmental activities relating to civil disturbances. Generally, because the statutory and constitutional scheme of our government leaves the protection of life and property and the maintenance of public order largely to state and local governments, the Attorney General has pursued a policy against commitment of federal forces until advised by the appropriate state officials that the situation is beyond their control.

December 23, 1981

MEMORANDUM OPINION FOR
THE COUNSEL TO THE PRESIDENT

In response to pressure from Maine potato farmers threatened by competition from Canada, Maine's Department of Agriculture has issued regulations which require inspectors, inspection fees, and permits for all potatoes entering the state. Because the regulations appear on their face to offend the Commerce Clause of the Constitution, the Justice Department sued in federal court to have them struck down. *United States* v. *Maine*, No. 81-0458 P (D. Me., filed Dec. 7, 1981). On Tuesday, December 8, Judge Edward T. Gignoux, Chief Judge of the United States District Court for the District of Maine, denied the federal government's request for a temporary restraining order. Following a hearing on December 21 and 22, Judge Gignoux granted the motion for a preliminary injunction yesterday afternoon. Unless the state voluntarily withdraws the regulations within the next few days, the judge has said that he will enter a final injunction by next week. The preliminary injunction is enforceable against the named defendants—the State of Maine, the Governor, his Attorney General, and the State's Department of Agriculture—and their agents. Fed. R. Civ. P. 65(d).

422

This responds to your request for information on the options available to the U.S. Attorney General and the President should Maine farmers, individuals not covered by the injunction, attempt to thwart the effect of the injunction by obstructing highways on the Maine-Canada border.

## I. Scenario

Assuming the farmers follow the same pattern as their last demonstration in 1980, they will use potatoes, trucks, and other heavy equipment to block the highways at border crossings in northeastern Maine.[1] In 1980, when nine border stations over a 100-mile stretch were involved, two arrests were made on the first day of the demonstration by the state police.[2] Border traffic was rerouted to other crossings. The protest ended after two days when then Vice President Mondale promised to set up a task force to study the problem. We will assume for the purposes of this memorandum that state officials are unable or unwilling to intervene to end the protest.

If the farmers stage a low-key demonstration—merely dumping the potatoes and milling about—there may be no overt threat to either federal officers or to federal land or property at the border crossings themselves. In 1980, some potatoes apparently did roll under the canopies of the Customs Service sheds, but they were removed without incident. The demonstration could escalate, however, to the point where a mob threatens harm to Border Patrol or Customs Service agents and federal facilities. In 1980, for example, a state police officer inflicted a serious head wound on a farmer.[3]

## II. Potentially Applicable Statutes

Identifying federal statutes in this context is difficult. The statutory and constitutional scheme of our government leaves the protection of life and property and the maintenance of public order largely to state and local governments. Only when civil disorder grows beyond a state's ability to control or threatens federal rights does the federal government generally intervene. The following statutes may become

---

[1] N.Y. Times, March 28, 1980, at 16, col. 3; *id.* March 29, 1980, at 6, col. 5; *id.,* March 30, 1980, at 26, col. 6. Apparently, only the lane carrying traffic into the United States was blocked. Telephone conversation with William D. Slyne, Branch Chief, Special Operations, United States Customs Service, (566–2957) (December 10, 1981).

[2] N.Y. Times, March 29, 1980, at 6, col. 6. Governor Brennan was quoted as saying he would make every effort to clear the roads, although he was reluctant to use violence. *Id.*

[3] Slyne conversation, *supra* n.1.

applicable, depending upon what course the farmers and state officials take.

1. *Obstruction of highways:* Highways in the United States are owned by the states, even though often built in large part by federal funds, and are, therefore, generally under state jurisdiction.[4] Blockage of a state highway is not usally a matter of federal concern. However, federal law prohibits interference with the right to travel. 18 U.S.C. § 241,[5] and 42 U.S.C. § 1985(3).[6] Private conspiracies to harm travelers and obstruct their passage have been prosecuted under these acts. *See Griffin* v. *Breckenridge,* 403 U.S. 88 (1971); *United States* v. *Guest,* 383 U.S. 745, 757–60 (1966). In 1974, the United States obtained indictments of persons participating in a coordinated truckers' strike that was intended to interfere with the interstate travel rights of non-striking truckers.[7] Federal law also prohibits, during a civil disturbance, the injury, intimidation of, or interference with anyone engaged in interstate commerce. 18 U.S.C. § 245(b)(3).[8]

It is also possible that the potato farmers might fall afoul of the Sherman Act's antitrust provisions,[9] since they are acting in concert in an effort to restrain trade.

If an unruly mob attacks Canadian drivers, we could consider initiating prosecutions under 18 U.S.C. § 245(b)(2)(E), which makes it unlawful to injure, intimidate, or interfere with "any person because of his . . . national origin and because he is or has been . . . traveling in or using any facility of interstate commerce." Likewise, the use of extortion to obtain compliance from other farmers or Canadians might violate 18 U.S.C. § 1951(a), (b)(2). *See also* 18 U.S.C. § 1952(a)(2), (b)(2).

---

[4] Telephone conversation with L. Harold Akens, Jr., Special Assistant to the Chief Counsel, Federal Highway Administration, December 8, 1981.

[5] If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

> If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured . . .

18 U.S.C. § 241.

[6] If two or more persons in any State or Territory conspire or go in disguise on the highway or the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . 42 U.S.C. § 1985(3)

[7] Letter from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, to the Honorable John D. Dingell, U.S. House of Representatives (April 16, 1974).

> [8] Whoever, whether or not acting under color of state law, by force or threat of force willfully injures, intimidates or interferes with . . . during or incident to a riot or civil disorder, any person engaged in a business in commerce or affecting commerce, including, but not limited to, any person engaged in a business which sells or offers for sale to interstate travelers a substantial portion of the articles, commodities or services which it sells . . . .

18 U.S.C. § 245(b)(3).

[9] Every . . . conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1.

Because of the burden that obstructions on the highway place on interstate commerce, the United States can either go into court to obtain an injunction against any impediment to the passage of interstate or foreign commerce and to delivery of the mails, *In re Debs,* 158 U.S. 564, 581–83 (1895), or can choose to use force. *Id. Debs* involved a major strike against the Pullman Co. that attempted—often, it was alleged, by violence—to shut down several interstate railroads. The United States, noting that mail, foodstuffs, fuel, and passengers were all carried by the railroads, obtained an injunction against "any" person who attempted to interfere in any manner with the named railroads. *Id.* at 570. When Eugene Debs, jailed for contempt of this order, sued for a writ of habeas corpus, the Supreme Court explicitly chose, *id.* at 600, to rest its denial on the broad ground of the federal government's inherent authority to enforce its jurisdiction "over every foot of soil within its territory and [to act] directly upon each citizen . . . ." *Id.* at 599. "[I]n the exercise of those powers it is competent for the nation to remove all obstructions upon highways, natural or artificial, to the passage of interstate commerce or the carrying of the mail . . . ." *Id.* There is a statute explicitly prohibiting obstruction of the mail. 18 U.S.C. § 1701.[10]

2. *Attack on federal officers or property:* Several statutes protect federal officers and property. During a civil disorder—a public disturbance by more than three people involving acts of violence, 18 U.S.C. § 232(1)— it is a felony to impede a law enforcement officer in his official duties. 18 U.S.C. § 231(a)(3).[11] Assault on or resistance to customs and immigration officers is specifically forbidden, 18 U.S.C. § 111,[12] as are rebellions against the authority of the United States, 18 U.S.C. § 2383,[13] and

[10]     Whoever knowingly and willfully obstructs or retards the passage of the mail, or any carrier or conveyance carrying the mail, shall be fined not more than $100 or imprisoned not more than six months, or both.

18 U.S C. § 1701. Foreign mail is considered mail of the United States. 18 U.S.C. § 1692. Note that the Postal Service is now an independent establishment with authority to sue in its own name, 39 U.S.C. § 401(1) and any suit by the Attorney General might well require its concurrence. 39 U.S.C. § 409(d).

[11]     (3) Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—
        Shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 231(a)(3).

[12]     Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

18 U.S C. § 111. Section 1114 is a list of covered officials.

[13]     Whoever incites, sets on foot, assists, or engages in any rebellion or insurrection against the authority of the United States or the laws thereof, or gives aid or comfort thereto, shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and shall be incapable of holding any office under the United States.

18 U.S.C. § 2383. *See also* 18 U S.C § 2384 (conspiracy).

[14]     Whoever willfully injures or commits any depredation against any property of the United States, or of any department or agency thereof, or any property which has been or is being manufactured or constructed for the United States, or any department or agency thereof, shall be punished . . . .

18 U.S.C. § 1362. *See also* 40 U.S.C. §§ 318–318d (security provided by GSA)

willful injury to United States property, 18 U.S.C. § 1361,[14] or certain kinds of communications equipment, 18 U.S.C. § 1362. Arrests may be made by the Federal Bureau of Investigation (FBI), 18 U.S.C. § 3052, United States Marshals, 18 U.S.C. § 3053, and Secret Service agents, 18 U.S.C. § 3056. (Note that Immigration and Naturalization Service (INS) agents may only arrest for violations of the immigration laws, 8 U.S.C. §§ 1324(b), 1357, and customs officers are generally limited to arrests for violations of the customs laws, unless armed with a warrant. 19 U.S.C. § 1581(f); 26 U.S.C. § 7607(2)).

3. *Presidential authority:* In extreme situations, the President may call out the National Guard or the Army to put down rebellions that threaten enforcement of federal law, 10 U.S.C. § 332,[15] and to protect against deprivations of constitutional rights caused by failure to enforce state or federal law. 18 U.S.C. § 333.[16] The application of these two statutes is explored fully in "The Use of Military Force Under Federal Law to Deal with Civil Disorders and Domestic Violence" (1980), a Department of Justice manual based in large part on the work of former OLC Deputy Assistant Attorney General Lawton.

4. *Enforcement of state law:* "We think it clear that the FBI has no *federal* authority to take action with respect to violations of state law, even in exigent circumstances." Memorandum for the Director of the FBI from Assistant Attorney General Harmon, February 24, 1978, at 1. After noting that several courts have agreed with this view, the opinion states that "if no federal statute authorizes arrests in a particular situation, state law governs." *Id.* at 2. The issue, therefore, becomes whether federal law enforcement officers are considered officers under Maine law or, if not, what arrest authority Maine grants private citizens.[17]

---

[15] Whenever the President considers that unlawful obstructions, combinations, or assemblages, or rebellion against the authority of the United States, make it impracticable to enforce the laws of the United States in any State or Territory by the ordinary course of judicial proceedings, he may call into Federal service such of the militia of any State, and use such of the armed forces, as he considers necessary to enforce those laws or to suppress the rebellion.
10 U.S.C. § 332

[16] The President, by using the militia or the armed forces, or both, or by any other means, shall take such measures as he considers necessary to suppress, in a State, any insurrection, domestic violence, unlawful combination, or conspiracy, if it—
  (1) so hinders the execution of the laws of that State, and of the United States within the State, that any part or class of its people is deprived of a right, privilege, immunity, or protection named in the Constitution and secured by law, and the constituted authorities of that State are unable, fail, or refuse to protect that right, privilege, or immunity, or to give that protection; or
  (2) opposes or obstructs the execution of the laws of the United States or impedes the course of justice under those laws.
10 U.S.C. § 333

[17] *See United States* v. *Carter,* 523 F.2d 476 (8th Cir. 1975); *Ward* v. *United States,* 316 F.2d 113 (9th Cir. 1963), *cert. denied,* 375 U.S. 862 (1963). The FBI has, on prior occasions, expressed policy objections to being used to enforce state laws. Memorandum for the Attorney General from Assistant Attorney General White, September 17, 1957.

Law enforcement officers[18] in Maine may make a warrantless arrest for violations of a number of potentially applicable state statutes: riot, Me. Rev. Stat. Ann., tit. 17-A, § 503 (Supp. 1980); unlawful assembly, *id.* § 504; obstruction of public ways, *id.* § 505; assault, *id.* § 207; criminal threatening, *id.* § 209; reckless conduct, *id.* § 211; obstruction of government administration, *id.* § 751; and criminal mischief, *id.* § 806. *See id.* § 15(1)(A)(5). Assuming, despite the broad language, that the definition of a Maine "law enforcement officer" does not cover federal agents, all federal officials, including INS and Customs officers, can act as private citizens. Maine law permits private citizens to make a warrantless arrest for any of the listed crimes that take place in their presence *except* unlawful assembly and obstruction of the public ways. *Id.* § 16(2)(A). The Memorandum for the Director of the FBI, *supra,* discusses the potential liability of the agents and the United States government if the state law is incorrectly applied. Memorandum, at 6–9.

### III. Conclusion

The Attorney General is the chief civilian officer in charge of coordinating all federal governmental activities relating to civil disturbances.[19] Depending upon the seriousness of the disturbance, he may wish to consult with the Border Patrol, Customs Service (Department of Commerce), the State Department, the United States Trade Representative (Department of Agriculture), and the local United States Attorney, as well as state officials. Memoranda written during prior incidents reveal a policy against commitment of federal forces until the governor of the state has used all available local resources and is willing to advise that the situation is beyond state control.[20] If it is decided, as a policy matter, that the federal government should inter-

---

[18] This is "any person who by virtue of his public office employment is vested by law with a duty to maintain public order . . . . or to make arrests for crimes . . . ." Me. Rev. Stat. Ann., tit. 17-A, § 2(17). Maine completely revised its criminal code within the last two years and there are no cases interpreting this section.

[19] Interdepartmental Action Plan for Civil Disturbances at 2 (1969).

[20] *See, e.g.,* Memorandum for the Attorney General from Assistant Attorney General Harmon, September 9, 1977 (coal strike in West Virginia).

vene, we should probably explore in more depth the possibility of obtaining an injunction against any persons who are obstructing the passage of interstate commerce and the mails.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*